**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF TEXAS
HOUSTON  DIVISION**

| | | |
|---|---|---|
| **STEPHEN BARBEE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No._____** |
| **vs.** | § | |
| **BRYAN COLLIER,** Executive Director, | § | |
| Texas Department of Criminal Justice | § | |
| Huntsville, Texas | § | |
| | § | |
| **BOBBY LUMPKIN,** Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | **(Death Penalty Case)** |
| Division, Huntsville, Texas | § | |
| | § | |
| **KELLY STRONG,** Senior Warden, Texas | § | **Mr. Barbee is scheduled to be** |
| Department of Criminal Justice, | § | **executed on November 16, 2022** |
| Huntsville Unit, | § | |
| Huntsville, Texas, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

## INTRODUCTION

1. Plaintiff Stephen Barbee suffers from well-documented physical ailments, including arm immobility, that will prevent him from being executed without the infliction of torture. He is incarcerated at the Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ") under a sentence of death in the custody of the Defendants.

-1-

2. The State of Texas intends to execute Mr. Barbee on November 16, 2022, under conditions that violate the Eighth and Fourteenth Amendments. Mr. Barbee seeks preliminary and permanent injunctive and declaratory relief, namely that this Court issue an injunction under 42 U.S.C. § 1983 directing the Defendants not to carry out Mr. Barbee's execution under conditions and procedures that will lead to severe and substantial pain as applied to him.  There is well-documented evidence of Mr. Barbee's severe lack of range of motion in both arms and his inability to straighten his arms and lie on the gurney palms-up, per the normal execution procedures. Forcing him to do so would amount to torture.  Despite being well aware of Mr. Barbee's condition and physical limitations for many years, TDCJ has refused to disclose whether they have made any accommodations or modifications to the execution procedures in order to prevent the infliction of cruel and unusual pain and suffering on Mr. Barbee in violation of the Eighth Amendment.

3. Relief is necessary to ensure that Mr. Barbee is executed only in a manner that does not violate his constitutional rights under the Eighth and Fourteenth Amendments. Mr. Barbee's lawsuit rests on the specific and unique facts stemming from his serious medical conditions and does not generally challenge Texas's protocol or procedures applicable to all prisoners.

**JURISDICTION**

4. This Court has jurisdiction under 42 U.S.C. § 1983 for violations and threatened violations of his rights secured by the United States Constitution and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress); 28 U.S.C. § 2201 (declaratory relief); and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

-2-

## VENUE

5. Venue lies in this Court under 28 U.S.C. § 1391 because Defendants maintain offices in the Southern District of Texas. Venue is also proper because the event giving rise to this lawsuit, the execution of Mr. Barbee, is scheduled to occur in this district, in Huntsville, Texas. The Defendants are residents of Texas or are located in the State of Texas.

## PARTIES

6. Plaintiff Stephen Barbee is incarcerated under a sentence of death at the Polunsky Unit of TDCJ in Livingston, Texas in the custody of the Defendants and under the control and supervision of TDCJ.  He is scheduled to be executed on November 16, 2022.

7. Defendant Bryan Collier is the Executive Director of TDCJ. He is being sued in his official capacity.

8. Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division of TDCJ.  Mr. Lumpkin has the power, by statute, to determine and supervise the manner by which death-sentenced inmates are executed. Tex. Code Crim. Proc. Art 43.14.  He is being sued in his official capacity. The state trial court has ordered Mr. Lumpkin to carry out Mr. Barbee's scheduled execution.

9. Defendant Kelly Strong is the Senior Warden of the Huntsville Unit, where the State of Texas carries out executions. She is being sued in her official capacity. Because Ms. Strong is the warden of the Huntsville Unit, she is responsible for supervising the scheduled execution in this case.

## PROCEDURAL HISTORY

10. Plaintiff Stephen Barbee was tried and convicted of capital murder in February 2006 for

the deaths of Lisa and Jayden Underwood in Tarrant County, Texas. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence on appeal in *Barbee v. State*, No. AP-75,359 (Tex. Crim. App. December 10, 2008) (not designated for publication). The CCA denied relief in Mr. Barbee's initial state habeas proceeding. *Ex parte Barbee*, No. WR-71,070-01 (Tex. Crim. App. January 14, 2009) (per curiam) (not designated for publication).

11. On October 4, 2010, Mr. Barbee filed an initial federal habeas petition in the Northern District of Texas challenging his state court conviction and sentence. On October 2, 2013, he filed an amended federal habeas petition. On July 7, 2015, the federal district court entered a final memorandum and order denying all claims and also denying a certificate of appealability. *Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. Sept. 1, 2015).

12. Mr. Barbee appealed to the Fifth Circuit and on November 23, 2016, the United States Court of Appeals for the Fifth Circuit granted a certificate of appealability on the issue of whether he was deprived of his Sixth Amendment rights because trial counsel rendered ineffective assistance of counsel by conceding Barbee's guilt at the guilt phase of trial during closing argument. *Barbee v. Davis*, 660 F. App'x. 293 (5th Cir. 2016).

13. On March 21, 2018, the Fifth Circuit issued an opinion denying relief. *Barbee v. Davis*, 728 Fed.Appx. 259 (5th Cir., March 21, 2018), and on November 19, 2018, the Supreme Court denied certiorari. *Barbee v. Davis*, 139 S. Ct. 566 (2018).

14. On May 9, 2019, the trial court set an execution date of October 2, 2019 for Mr. Barbee. Mr. Barbee then filed a subsequent state habeas application in the CCA raising a claim under *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), that his trial counsel's unauthorized concession of guilt to the jury violated his Sixth Amendment autonomy right to maintain his innocence at trial. The CCA

stayed Mr. Barbee's execution, *Ex parte Barbee*, 2019 WL 4621237 (Tex. Crim. App. Sept. 23, 2019), and requested further briefing on the *McCoy* issue.

15. On February 10, 2021, the CCA issued an opinion denying Mr. Barbee's application, *Ex Parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App. 2021). On March 30, 2021, the State submitted a motion to set an execution date for Mr. Barbee and on July 6, 2021, the trial court signed an "Order Setting Execution Date" of October 12, 2021 for Mr. Barbee.

16.  On July 10, 2021, a petition for writ of certiorari for Mr. Barbee was filed in the United States Supreme Court. *Barbee v. Texas*, No. 21-5093. The State filed their Brief in Opposition on August 4, 2021 and Mr. Barbee filed his reply brief on August 18, 2021. The Supreme Court denied this petition on October 4, 2021. *Barbee v. Texas*, No. 21-5093.

17. On October 1, 2021, Mr. Barbee filed a subsequent petition for writ of habeas corpus in the Texas Court of Criminal Appeals raising two claims: one, that recent new evidence and disclosures about the medical examiner buttressed his innocence claim, and two, the claim raised here, that the execution procedures normally used by the Texas Department of Criminal Justice would subject him to cruel and unusual punishment due to his well-documented arm immobility and range-of-motion disabilities. *Ex parte Barbee*, No. 71,071-04. That Court denied the application on the grounds that Mr. Barbee failed to make a *prima facie* showing on the first ground and that his second claim was not cognizable in state habeas.  *Ex parte Barbee*, 2021 WL 4713629 (Tex. Crim. App. Oct 8, 2021) at *1. Mr. Barbee has thus exhausted his remedies on this claim in state court.

18. On September 21, 2021, Mr. Barbee filed a civil complaint under 42 U.S.C. § 1983, alleging that the State of Texas intends to execute him in a manner that unconstitutionally burdens his religious exercise under the First Amendment to the United States Constitution as well as the

Religious Land Use and Institutionalized Persons Act of 2000. *Barbee v. Collier, et. al*, No. 4:21-cv-03077 (SD TX). After subsequent litigation, the federal district court stayed Mr. Barbee's execution on October 7, 2021. *Barbee v. Collier et. al*, 566 F. Supp.3d 726, 738-739 (S.D. Tex., Oct. 7, 2021). On November 29, 2021, that Court stayed and administratively closed that case. (ECF. No. 21).

19. Pursuant to the Supreme Court's decision in *Ramirez v. Collier*, 142 S. Ct. 1264 (2022), on March 24, 2022, the parties jointly moved to reopen the RLUIPA litigation on April 1, 2022. (ECF No. 22). Despite the fact that the federal district court had yet to set a briefing schedule, on May 27, 2022 the Defendants filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), following their own proposed, but not adopted, schedule. (ECF No. 28). The current RLUIPA litigation concerns any yet-to-be-determined tailored safeguards to prevent the reoccurrence of infringements on Mr. Barbee's religious freedoms.

20. On July 15, 2022, the Tarrant County District Attorney's Office filed in the trial court the "State's Third Motion for Court to Enter Order Setting Execution Date," without prior notice to Barbee or his counsel. That motion referenced Mr. Barbee's ongoing federal RLUIPA suit and acknowledged that the federal court had stayed Mr. Barbee's execution, but asserted that "there is no federal court impediment to setting the defendant's execution," citing *Ramirez v. Collier*, 142 S. Ct. 1264 (2022).

21. On July 22, 2022, Barbee, through counsel, filed his opposition to that motion, pointing out that there was a current federal stay of execution in effect. On August 9, 2022, the Tarrant County District Attorney's Office filed a response to Mr. Barbee's opposition to the date-setting motion asserting that their policy had been reevaluated and they were now allowing physical touching, the holding of the condemned's hand and audible prayer by Mr. Barbee's spiritual advisor

in the execution chamber.

22. Despite having before it the full facts regarding the federal stay and the ongoing RLUIPA litigation, on August 12, 2022 the trial court signed what it termed a "Duplicate Order Setting Execution Date" on August 12, 2022.[1]  That Order, presumably prepared by the Tarrant County District Attorney, stated that "there is no federal court impediment to setting the defendant's execution" and "Defendant has exhausted his avenues for relief through the state and federal courts, and there are no stays of execution in effect in this case."[2]

23. On August 19, 2022, Mr. Barbee, through counsel, filed a motion for leave to file a petition for mandamus and the petition in the Texas Court of Criminal Appeals. *Ex parte Barbee*, WR-71,070-05.  On August 26, 2022, the respondent and real party in interest the State filed a response to the mandamus petition and on September 6, 2022, Mr. Barbee filed a reply. That matter is currently pending in the CCA.

24. In the ongoing RLUIPA litigation in the federal district court, on September 15, 2022, that Court ordered the parties to "provide briefing in ten (10) days which discusses whether issuing an injunction in this case, as requested by Barbee in his complaint, would be appropriate." (ECF 36, Order of Sept. 15, 2022 at 3). On September 26, 2022, the parties submitted their briefs.

**Note Regarding Timeliness.**

25. This lawsuit is being presented as soon as feasibly possible. The trial court set the execution date on August 12, 2022, barely more than the required minimum 91 days prior to the execution date, and despite the fact that there was a federal stay of execution currently in effect.

---

[1]   Appendix 1.

[2]   *Id.* at page 5 of 7.

Additionally, Mr. Barbee has been without appointed counsel since early 2019, except for clemency proceedings.  He has submitted three requests for counsel, the latest of which is unopposed and still pending in the trial court.  The lack of appointed counsel, which would entail funding for investigation, experts, and document collection has severely hampered the presentation of these issues, especially in the very short time since an execution date was prematurely set.

26. For well over a year Mr. Barbee has sought information about the plans for his execution, whether he will be forced to lie on the gurney with arms straight and palms up, which would amount to torture, yet TDCJ has refused to supply any information as to the conditions and plans for his execution. Hence, this lawsuit is being presented as soon as feasibly possible.  TDCJ's delay in providing this information has resulted in this action.

## ILLEGAL CONFINEMENT AND RESTRAINT

27. Mr. Barbee is currently being illegally confined and restrained of his liberty by the State of Texas on death row in the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, in Livingston, Texas, in the custody of the Defendants. *See* Article 11.14, TEX. CODE CRIM. PROC.

## SUMMARY OF CLAIMS  PRESENTED AND UNDERLYING FACTS IN SUPPORT

28. These counts are brought under the Eighth and Fourteenth Amendments and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq* and present well-documented evidence of Mr. Barbee's severe lack of range of motion in both arms and his inability to straighten his arms and lie on the gurney palms-up. Forcing him to be executed in the normal manner would amount to torture as he cannot straighten his arms. Despite their knowledge of these disabilities, the Texas Department of Criminal Justice has refused to disclose whether they have made any accommodations

-8-

or modifications to the execution procedures.

**MR. BARBEE'S WELL-DOCUMENTED ARM IMMOBILITY AND RANGE-OF-MOTION DISABILITIES MEAN THAT TDCJ'S EXECUTION PROCEDURES WILL SUBJECT HIM TO CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND THE AMERICANS WITH DISABILITIES ACT.**

29. Mr. Barbee's issues with arm immobility have been ongoing for a long time, virtually from when he was first placed on death row.  As shown from his medical records, his range of movement in both arms has steadily worsened over the last 15 years and has been extensively documented.  He is unable to fully extend his arms, is unable to be handcuffed without extensions, and has submitted numerous I-60 grievances to bring his arm condition and limitations to the attention of the prison authorities. TDCJ, despite being aware for many years of these severe physical disabilities, is acting with deliberate indifference to them and has refused to divulge whether Mr. Barbee will be executed in a manner that would amount to torture and cruel and unusual punishment in violation of the Eighth Amendment. TDCJ has refused to divulge what, if any, ameliorative measures they may take in order to prevent this needless torture.[3]

**i. Mr. Barbee's prison medical records show he has diminished range of motion and movement in both arms.**

30. As early as May 5, 2006, soon after he arrived on death row, Mr. Barbee's patient chart noted he was "unable to raise arms...w/o pain, numbness to arms." [page 368].[4]  On September 9,

[3]  Appendix 9 is a photo of the Texas execution gurney showing apparently rigid non-bendable armrests.

[4]  Relevant excerpts from Mr. Barbee's prison medical records are at Appendix 2.  References to "page" is to the page numbers on the bottom right hand side of the page. For easier reference, they are organized in the Appendix in chronological order and not by their TDCJ page numbering, which

-9-

2006, Mr. Barbee submitted an I-60 grievance and asked for extended handcuffs because when he was cuffed, "the guards have to pull and twist my arms together...the guards had to twist really hard and now my elbows are swollen and hurting a lot worse." [page 1191]. On the same day, the clinic notes of correctional managed care indicated "both elbows swollen with fluid and painful with usual handcuffs." [page 469].  It was also noted that "bilateral elbows–fluid filled; pain with movement of bilateral elbows...requesting order for extended handcuff pass." [Id.] Thus, Mr. Barbee was experiencing elbow and arm issues at very early stages of his incarceration on death row and he requested extended handcuffs to deal with his arm immobility problems.

31. Shortly thereafter, on September 23, 2006, Mr. Barbee submitted another I-60 grievance stating that "it's at the point now where I'm having trouble washing my hair, and cleaning myself when I go to the rest room." [page 1190].  On October 26, 2006, Mr. Barbee submitted another I-60 grievance because "the guards are hurting me more and more because of my shoulders and arms can't be cuffed with the small cuffs...they have to pull and twist to be able to cuff me." [page 1187].

32. As Mr. Barbee's condition worsened, on August 8, 2008, his medical report noted "atrophy of 1 arm and leg." [page 486]. On August 19, 2008, Mr. Barbee stated that "[m]y left arm is getting where I can't use it very well!" [page 1092].  On July 24, 2009, it was similarly noted that there was "atrophy of 1 arm and leg." [page 483].

33. On August 15, 2009, on Mr. Barbee's patient chart it was noted that his right arm "does not extend at elbow completely." [page 662].  Again on August 25, 2009, it was noted on Mr. Barbee's patient chart that his right arm does not extend @ elbow completely" and he has to use a walker. [page 659].  On November 11, 2009, it was noted that the extremity pain was first observed

is non-chronological.

on March 7, 2008. [page 628].

34. On December 8, 2009, Mr. Barbee submitted an I-60 grievance stating that "I have repeatedly asked for medical help for my left arm going on 4 years now! My arm is locked and I need to see why its locked and hurts so BAD! My arm is locked up because of refusal of medical care. Why is medical ignoring my many request. Not only written request(s) but that UTMB wouldn't do anything–why?" [page 1019]. Shortly thereafter, n December 22, 2009, an x-ray was ordered for Mr. Barbee due to "left elbow—chronic pain, decreased ROM (range of motion)." [page 1018].

35. His arm situation had worsened by April 30, 2010, when it was noted that there was "worsening radiculopathy in both upper and lower exten (sic) due to c-spine DJD." [page 473]. On June 17, 2010 Mr. Barbee submitted an I-60 grievance because "I need surgery on my neck. I'm losing the range of motion on my last good arm!" [page 995].

36. On July 21, 2010, Mr. Barbee submitted another I-60 grievance about his arm condition. [page 987]. He stated that despite repeated grievances, he "has lost a great deal of the range of motion in my left arm. I can't touch my face. Well my right arm is starting to do the same as my left. I have symptoms of nerve damage. If medical continues to delay my medical care, I won't be able to take care of myself. My arms will be shot! I'm asking for help in this!" [page 987]. On August 18, 2010, his shoulder disorder and joint pain were again noted. [page 615]. On the same date, Mr. Barbee's patient care chart listed "weakness of left upper extremity" and "muscle weaknesses of lower extremity." [page 349].

37. Mr. Barbee's arm immobility continued to worsen into 2011. On July 7, 2011, Mr. Barbee's patient chart noted that his "upper extremity pain [is] neuropathic in character" [page 605].

Shortly thereafter, on July 22, 2011, a radiology report from correctional managed care indicated degenerative changes in both the right and left wrists and "destruction of the radioulnar and humeroulnar joints" of the left elbow. [page 346-347]. It was thought to be longstanding and "sclerosis is seen." [page 346]. The overall impression was that "[t]here is an advanced degenerative osteoarthritis with destruction of the radioulnar/radiohumeral joints." [page 346].

38. Further arm immobility was identified on July 27, 2011 when a UTMB radiology report indicated "[m]ild degenerative changes are seen within the elbow joint." [page 444]. On the same date, July 27, 2011, an expedited referral for treatment noted "multiple joint pain for past 5 years involving shoulders, elbows, wrists, fingers, hips. Patient is losing ROM (range of movement) of his elbows left-right." [page 455].

39. On August 8, 2011, a UTMB managed care memo noted "polyarticular joint pains, joint swelling, limitations of movement of hips, shoulders and elbows, and prolonged morning stiffness." "The erosions seen on elbow film are unusual (albeit not unheard of) for Lyme arthritis." [page 58].

40. On September 28, 2011 it was noted that "patient has decrease[d] ROM (range of movement) of left elbow, Right hip joint." [page 450-451]. The next day, September 29, 2011, it was again noted that a provisional diagnosis was "inflammatory arthritis" with "decreased ROM (range of movement) of left elbow." [page 446].

41. On December 6, 2012, UTMB Health issued a 3-page "office visit" report. [pages 51-53] The report indicated chronic "neck pain, back pain, and extremity weakness." A diagnosis of "cervicalgia" was noted along with "weakness of left upper extremity." [page 51].

42. A 4-page "office visit" report by UTMB Health was issued on March 7, 2013. [pages 45-48]. Mr. Barbee reported "worsening weakness in his right arm. He states he has lost the ability to

-12-

use the left arm.' [page 46].  A cervical collar was ordered. [page 47]. Symptoms were worsening. [page 47]. "Limited ROM" (range of movement) was again noted on July 16, 2013 in a UTMB service referral request. [page 421].

43.  The next month, on August 13, 2013, Mr. Barbee summarized his problems in correctional care nursing notes: "I went to the hospital on the 8th. They said my elbows are now bone on bone.  I'm in so much pain and I'm wasting away. Eventually I'm not going to be able to take care of myself...the doctor at HG said the problem with my joints could be due to Lyme Disease." [page 323].  The clinic noted as to his right elbow, "diffuse joint space narrowing is seen, mild joint effusion is present with displacement of the anterior and posterior fat pads." [*Id.*] As for his left elbow, "[s]ince the prior [examination], new marginal osteophytes have developed, the collapse of the joint spaces is still present, joint effusion given by displacement of the anterior posterior fat pads is also identified." [*Id.*] The clinic's impression was "BILATERAL symmetric joint space narrowing of the elbow joints, in keeping with inflammatory arthritis such as RA." [page 323].

44. Once again, on September 6, 2013, in a UTMB health service referral request, the clinical findings were "bilateral elbow pain" and the diagnosis was "limited ROM" (range of movement) [page 415]. On the same date, September 6, 2013, a physical therapy clinic note documented that Mr. Barbee "said his elbows are not extend fully and not able to reach his head." [page 37].  His main concern was "his both elbow (sic) and his [left] hip." [*Id.*]

45. Mr. Barbee's continued lack of arm mobility was again noted in an August 28, 2014 UTMB health service referral request where the clinical findings were "limited rom (range of movement) in elbows." [page 403].

46. An occupational therapy note on April 3, 2014 (from an April 1 visit) had a provisional

-13-

diagnosis of "limited ROM (range of movement) both elbows" and "degenerative osteoarthritis both elbows." [page 31].  Mr. Barbee stated "I have limitations in extending my elbows and I have pain in my elbows and shoulders." [*Id.*] Regarding his arm range of movement, his right elbow had only 38-114 degrees of extension and 24 to 109 degrees of flexion. [page 31]. The right arm pronation was 80/85 degrees right and 80/85 degrees left. The left elbow extension was 60 to 100 degrees and the flexion was 50 to 100 degrees. [*Id.*].  Right and left wrist range of movement issues were also noted. Mr. Barbee's limited arm range of movement issue was this clear by 2014, and has only worsened since then.  Even in 2014, he could not extend his arms fully outstretched as they would be on a gurney.

47. On April 4, 2014, an occupational therapy clinic note assessed "Patient presents with decreased AROM (arm range of movement) both elbows in extension and flexion...He has impaired forearm supination with more limitation on the left." [page 32]. Again on November 17, 2014, a UTMB health service referral request diagnosed "limited ROM (range of movement) in elbows." [page 401].

48. On March 31, 2015, Mr. Barbee went to the Estelle Unit for treatment and stated that his hands cannot be cuffed behind his back "because my arms are so bad with the loss of range of motion it won't do like [hands cuffed behind him]."  (Page 785-786). This had been the procedure for three years because when he was cuffed behind his back :" thought they were going to break my arms. When I got back, there were deep purple impressions which stayed for a few days." Mr. Barbee filed an I-60 at that time which was submitted on April 13, 2015.  (*Id.*)

49. In 2016, Mr. Barbee's arm issues continued to worsen.  A correctional managed care radiology report dated August 11, 2016 focused on his "problem extending lt (left) elbow." [page

-14-

341].  The "joint space [is] narrowing and subchrondral sclerosis are seen' on the right elbow. [page 341].  The left elbow "is in a semi-flexed position.  Severe joint space narrowing and sclerosis is present. Bony remodeling of the capitellum is suspected. No acute fractures appreciated. Evaluation for joint effusion is limited due to patient positioning." [*Id.*] The diagnostic impression was "severe bilateral osteoarthrosis, more prominent on the left. The left elbow is held in flexion which limits evaluation." [page 341].

50.  On August 15, 2016, Mr. Barbee was told that the medical department had "reviewed the x-rays of your elbows, shows osteoarthritis with joint space narrowing. Continue working on gentle range of motion exercises as we discussed." [page 719]

51. On August 25, 2016, Mr. Barbee submitted an I-60 grievance stating that the medical department said he had severe arthritis and now "osteoartheosis." [page 712]. On December 9, 2016, Mr. Barbee was given a physical therapy protocol "for left trochanteric bursitis." [page 509].

52. Mr. Barbee submitted an I-60 grievance on September 28, 2017 stating that he was not able to go to his medical appointment because "transportation wouldn't take me because I can't place my arms in a certain direction when they place the handcuffs on me.  I have osteoarthritis in my arms." [page 665].

53. On February 9, 2018, upon return from a medical appointment, it was noted that Mr. Barbee suffered from "multilevel degenerative changes [that] result in up to moderate spinal canal stenosis...Severe neural foraminal narrowing is identified at the same level, mildly progressed from before." [page 500].

54. On February 15, 2018, Mr. Barbee submitted an I-60 grievance regarding another missed medical appointment which transportation refused because due to his limited range of motion, Mr.

-15-

Barbee could not turn his arms a certain way. [page 646]  He stated "I lack the range of motion in my arms to do it per TDCJ policy. This is not the first time this has happened." [page 646].  On February 21, 2018 Mr. Barbee submitted another I-60 grievance about the missed medical appointment due to his being unable to be cuffed which was a result of his decreased range of motion issues. [page 641].

55. As Mr. Barbee's arm range of movement continued to decrease, on April 17, 2018 it was noted on a sick call request that he required "no cuff behind back" and "front triple cuffs when using walker." [page 630].

56. In 2018, Mr. Barbee continued to seek help in regard to his loss of range of motion in his arms. On July 10, 2018 he submitted an I-60 grievance form stating "I need to see whomever 'can evaluate and record' the range of motion in both of my arms." [page 623].  He added, "This evaluation will have to be here at Polunsky Unit becasue the transportation people will not take me anywhere, because of my arm's (sic).  I need to find out why my arm's (sic) are like this and what range of motion I have. Thank you!" [page 623].

57. Despite these repeated notices regarding his inability to be handcuffed in the normal position, these problems were still ongoing in late 2018.  In another I-60 grievance filed on October 3, 2018, Mr. Barbee asked why his neurosurgery appointment had been cancelled and once again the answer was "rescheduled due to non-compliance with hand restraints required for transportation." [page 605]. Repeatedly the transportation people failed to receive the information that Mr. Barbee cannot be handcuffed in the normal manner.

58. Mr. Barbee's lack of arm range of movement worsened to the point that on February 13, 2019,  he was "unable to clean [himself] after using the restroom." [page 583].  This was because

"my arms can't reach back there anymore." [*Id.*]

59. As a result of this limited arm mobility and decreased range of motion, on March 14, 2019 a "toilet aid" was ordered for Mr. Barbee.  This was to extend his arm so that he would be able to properly clean himself after going to the bathroom. [page 16].  On March 24, 2019, Mr. Barbee requested about this "special tool to help me clean my rear end after I use the restroom because my arm's (sic) have lost the range of motion to do that myself." [page 577]. Once again, on April 11, 2019, Mr. Barbee in an I-60 grievance requested his medical pass "for my walker and no cuffs behind back, no cuff to arm." [page 569].

60. A mental health outpatient services mental health report of January 26, 2021 noted that due  to his disabilities, Mr. Barbee was still in "restrictive housing" and his "osteoarthritis, unspecified" was still evident. [page 499].  Another mental health report of April 22, 2021 also noted the osteoarthritis [page 481] as did the mental health report of July 15, 2021. [page 473].[5]

61. On March 14, 2021, Mr. Barbee submitted a request that his medical passes be renewed, including his use of a wheelchair, a walker/rollator, a disability shower, no handcuffs behind his back and no handcuffs to both of his arms as he "can no longer turn arms and or wrist, where palms are face up." [page 488].

62. As a result of his limited range of motion with his arms, for many years Mr. Barbee was unable to cut his toenails.  The report of April 4, 2021 shows that he needed help to do this, as do many earlier reports. [page 489, 496, 507, 531, similar reports from 2018, 2016, 2015].

**ii. Mr. Barbee confirms that he cannot extend his arms or straighten them without**

---

[5] It should be noted that the mental health reports cover only mental health problems, mainly suicidal thoughts or plans or self-harm ideation, and do not cover physical health problems or complaints.

**inflicting torture**.

63. Mr. Barbee has submitted a declaration confirming that his well-documented issues with lack of range of motion in his arms will prevent his being placed on the gurney with arms outstretched without inflicting painful torture. (Appendix 3).

64. Mr. Barbee explains that he was issued a special medical pass on July 23, 2018  because he "no longer could have handcuffs placed on my arms per TDCJ policy which requires palms of either hand face upward." (*Id.* at 2). He also explains what is documents supra, that "[b]ecause of the loss-of-motion in both arms TDCJ transportation dept. refused to take me to the hospital for my medical appointments. I missed around 14 or so appt's straight, where UTMB quit setting them." (*Id* )  Mr. Barbee also explains that "I also have a special medical pass for a tool to clean myself after using the restroom because of the loss of my range-of-motion, I can no longer reach around to my back." (*Id.*)

65. When sleeping on his back "my arms stand up in the air." (*Id*. at 3.)  Mr. Barbee explains that he cannot straighten his arms or hold them out in front of himself, a disability which has caused the many handcuff issues described in his prison records, supra. (*Id*.)

66. Mr. Barbee states that "If someone wants my arms to straighten out in any way, I guess one would have to break my arms, because even forcing them, they won't straighten. It's been like this for years and it's getting worse." (*Id*. at 4).  *See* Appendix 9, showing rigid armrests in the Texas execution chamber.

**iii. Recent investigation confirms Mr. Barbee's lack of range of motion in both arms.**

67. Investigator Adrián de la Rosa of the Western District of Texas Federal Public Defender's Office confirms both the documented history and Mr. Barbee's personal assessment of his arm

mobility issues.

68. On September 3, 2021 Mr. De la Rosa visited Mr. Barbee at the Polunsky Unit. (Appendix 4 at 1). Mr. Barbee was brought to the visitation area in a wheel chair and had trouble getting into the interview booth. (*Id.*) When they were asked to change booths, he again struggled and "[h]is arms never fully extended out, they were in a constant bent state at the elbow." (*Id.*) "He looked to be in pain throughout" the three and a half hour interview. (*Id.*)

69. Mr. Barbee told the investigator that he is in almost constant pain. (*Id.* at 2.) "He said his arms constantly hurt." (*Id.*) "Mr. Barbee held out his arms in front of his body to show me his range of motion, and his arms were in a constant bent state. He never once held out his arms straight in front of his body or straight out to his side because he said he is unable." (*Id.*) In another factor that could cause unusual pain and suffering at the execution, "Mr. Barbee said he cannot turn his hands up, with his palms facing up toward the sky." (*Id.*)

70. When Mr. Barbee first arrived at TDCJ, his condition was normal, but he soon started having "issues and problems with his left arm, then his right leg began to give him grief, then his left lag and then his right arm." (*Id.*) "Stephen noted that his right arm isn't as bad as his left arm, and he has slightly more mobility, but not much." (*Id.*) He has trouble holding a can of soda. (*Id.*)

71. Mr. Barbee remembered the pain in his left arm starting around 2007 and "started 'drawing up,' tightening in toward his body, resulting in the constant state of his arm being bent at the elbow." (*Id.*) Although he has been diagnosed with arthritis, he has been taking genetic Cymbalta for nerve damage. (*Id.*)

72. When transported, "he is supposed to travel with his arms bent in front of his body, left arm under right arm, left palm facing up toward the sky and right palm facing down." (*Id.* at 3, with

picture of the position at 4).  As a result, Mr. Barbee was given a pass that allowed him to put his arms in front of him without palms facing upward. (*Id*. at 4).

73. When Mr. Barbee's date was set on July 6, 2021, he was called into Warden Dickerson's office on July 9 and told of his execution date. (*Id*.)  At that meeting, Mr. Barbee told the warden of "his inability to straighten his arms out once they'd place him on the gurney." (*Id*.)  "Stephen said the warden told him the arm restraints on the gurney come out like a cross.  He told Warden Dickerson that he won't be able to straighten out his arms for the needle." (*Id*. at 4-5).  The Warden asked Mr. Barbee to stand up and stretch out his arms, but Mr. Barbee was unable to do that." (*Id.* at 5). Mr. Barbee said that the only way they would be able to straighten out his arms would be if they broke them and the Warden laughed and said "That ain't gonna happen." (*Id*. at 5).  Mr. Barbee also told about the problems with his palms, that he cannot have them face upward unless his hands were above his shoulders. (*Id.*, with illustration).

74. Mr. De la Rosa provided another illustration about Mr. Barbee's arm range of motion limitations. (*Id*. at 6).  "From left to right, his right arm is bent at 45-degrees, his head would be at 90-degrees, and his left arm would be at 1135-degrees." (*Id*.)  When shown the extent of Mr. Barbee's arm immobility, Warden Dickerson took photos as Mr. Barbee "sat in a chair, leaned back, and did his best to raise his palms." (*Id*.)

75. Despite these serious issues, "Mr. Barbee hasn't heard anything about his concerns or about any sort of contingency plan TDCJ is going to use for his special circumstances. No one has told him anything about what they're going to do." (*Id*.)

76. Mr. Barbee also mentioned that at one of his medical trips to the Estelle Unit, "they measured his arm movement and radius, They used what looked like a ruler or protractor and took

-20-

measurements. Stephen said those should be in his medical records." (*Id.*)[6]

77. On September 15, 2022, Mr. De la Rosa made a follow-up visit to Mr. Barbee at the Polunsky Unit which confirmed the dire condition of his physical disabilities. (Appendix 4). In his declaration, Mr. De la Rosa noted that Mr. Barbee had trouble reaching for the telephone to communicate and "grimaced in pain when he reached toward the glass and again when he picked up the phone on his end." (Appendix 4, 2022 interview ). Mr. Barbee struggled to move in the interview booth and "seemed uncomfortable and uneasy, and he moved slowly. Mr. Barbee had a difficult time holding the phone as we spoke." (*Id.*) Even adjusting his grip on the phone, "he grunted in pain." (*Id.*) "Those sounds and his expression indicated he was in pain or discomfort throughout our conversation." (*Id.*)

78. Mr. Barbee had difficulty lifting a can of iced tea and "it was apparent from his movements that he does not have strength or mobility in his hands and arms. They appear stiff, contracted, and largely immobile." (*Id.*) He 'needed both hands to take a sip from the can." (*Id.*)

79. Mr. Barbee's mental health was also deteriorating as he "was more emotional and anxious in this meeting than in prior meetings. The extent of the change was surprising...His thoughts were scattered.  He appeared to be depressed." (*Id.*)

80. Mr. De la Rosa noticed that Barbee was brought to the visitation room in a wheelchair. (*Id.*) "In his current condition, it is clear that Mr. Barbee cannot move freely, with agility, with anything close to full range of motion, or with more strength than a small child possesses." (*Id.*) Mr. De la Rosa observed that "I do not believe, given how I saw him during this visit, that he could be

---

[6] Mr. Barbee is referring to the April 13, 2014 assessment discussed *supra* [page 31] where his arm mobility was measured.

dangerous to other inmates or the prison staff." (*Id.*)

**iv. Dr. Pamela Blake's recent examinations and diagnoses confirm that Mr. Barbee will be subject to torture if he is executed per TDCJ's normal procedures.**

81. Dr. Pamela Blake, a board-certified neurologist with offices in Houston, personally examined Mr. Barbee at the Polunsky Unit on September 24, 2021.[7]  She was asked to provide an opinion "as to the cause and status of the condition [of] the weakness affecting his arms, particularly regarding reduced range of motion in his elbows, and any complicating role that this condition may play in the administration of intravenous medications."[8] She examined Mr. Barbee's prison medical records, Mr. Barbee's declaration and that of Mr. De la Rosa, and conducted an interview and physical examination of Mr. Barbee.

82. Shortly before his arrest, Mr. Barbee suffered a major injury when a heavy steel pipe fell on his head, which cracked his hard hat and caused him to lose consciousness.[9] Although he recovered from that injury, shortly thereafter Mr. Barbee began to notice weakness in his arms and the "weakness gradually progressed." [10] "Mr. Barbee noted that the muscles of the left arm would occasionally spontaneously contract and the arm would "draw up" (meaning flex at the elbow) involuntarily. Mr. Barbee gradually lost the ability to extend (straighten) the left elbow within about a year."[11]

---

[7]  Dr. Blake's 2021 neurological evaluation is at <u>Appendix 5</u>.

[8]  *Id.* at 1.

[9]  *Id.* at 2.

[10]  *Id.*

[11]  *Id.*

83. After that, both his legs began to be affected and the his right arm, "beginning in about 2018."[12] "The weakness in the arms progressed steadily to the point at which Mr. Barbee lost function of both of his arms. The elbow joints became progressively more fixed, with progressively reduced range of motion, to the point at which Mr. Barbee had almost no functional use of the arms."[13] Dr. Blake noted that Mr. Barbee's "left arm is more affected with regard to reduced range of motion; there is  currently almost no movement of the left elbow."[14] Additionally, "there is reduced range of motion in the right elbow and also pain in the right arm, extending from the elbow along the back of the arm..."[15]

84. Dr. Blake confirmed that Mr. Barbee's records from UTMB showed "that the condition of Mr. Barbee's arms, and the reduced range of motion in them, has been an ongoing and prominent issue for him."[16] He filed numerous I-60 grievances in an effort to bring his arm issues to the attention of the prison authorities.[17] "In May 2006, Mr. Barbee noted that he could not raise his arms without pain."[18] He could not be handcuffed in the normal position and he "was having difficulty with personal hygiene due to progressively limited use of his arms."[19] By July 2010, Mr. Barbee

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 3.

[17] *Id.*

[18] *Id.*

[19] *Id.*

reported to the prison authorities that he could not touch his face.[20] He had "increasing pain and decreasing range of motion in the elbows."[21]  And "an x-ray in July 2011 noted joint destruction in the joints in the left elbow."[22]

85. By September of 2013, "Mr. Barbee was not able to extend his elbows fully and was not able to reach his head."[23] An April 2014 report "reported significantly reduced range of motion in both elbows: the elbow range of motion should normally span from 0 degrees (completely extended) to 180 degrees (completely fixed). The right elbow in April 2014 ranged in motion from 38-114 degrees, and the left elbow ranged in motion from 60-100 degrees. This is significantly reduced range of motion."[24]

86. Dr. Blake's diagnostic impression was that "Mr. Barbee has a progressive medical condition that has resulted in progressive loss of range of motion of numerous joints, including the bilateral elbow and wrists, and weakness of muscles in the upper and lower extremities."[25] "There is a highly unusual pattern of joint fixation and immobility affecting the bilateral elbows and wrists; both of these joints are in a fixed position which significantly limits the use of the extremities. Neither of the arms can be extended."[26]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*  Dr. Blake is referring to page 31 of <u>Appendix 2</u>.

[25] *Id.* at 4.

[26] *Id.*

87. Additionally, "[i]nvolvement of the chest muscles may predispose him to respitory failure under light anesthesia, as the muscles involved in breathing may become nonfunctional quickly, leading to asphyxiation prior to loss of consciousness."[27] Mr. Barbee is "not able to lay his arms flat. Multiple sources of information attest to the presence of reduced range of motion in the elbows, and to the prolonged duration of this condition. It does not appear to be possible that intravenous agents could be administered to the veins in the antecubital space (the elbow) without forcefully extending the arms, which would result in significant injury and pain in the elbows."[28]

88. A follow-up evaluation of  Mr. Barbee was performed by Dr. Blake on September 26, 2022. (also at <u>Appendix 5</u>). Dr. Blake again reviewed her prior records and Mr. Barbee's medical history.  She found that the weakness in both of Mr. Barbee's arms has progressively become more fixed and reduced, "to the point at which Mr. Barbee had almost no functional use of the arms." (*Id.*, 2022 evaluation at 2).

89. In September of 2022, Mr. Barbee continues to require a wheelchair and experience severe disabilities. (*Id.* at 3). Although this evaluation was not a contact visit, Dr. Blake was able to "assess in a more detailed manner, visually, the range of motion for multiple joints." (*Id.*) She found that Mr. Barbee was unable to extend his shoulders; his right elbow was fixed at about 130 degrees and the left elbow at about 90 degrees; and his wrists were fixed and immobilized. (*Id.*) Mr. Barbee was able to rise from the wheelchair only with great difficulty and had to lean on the interview table to support himself. (*Id.* at 5).

90. Dr. Blake concluded that "Mr. Barbee continues to exhibit a progressive medical

---

[27]  *Id.* at 5.

[28]  *Id.*

condition that has resulted in progressive loss of range of motion in numerous joints, including the bilateral elbow and wrists, and weakness of muscles in the upper and lower extremities. The disorder is much more prominent in the proximal joints, including the bilateral elbow and wrists, and weakness of muscles in the upper and lower extremities." (*Id.*)  She also found that "[t]his reduced range of motion has resulted in significant loss of function, such that he is no longer able to walk or to attend to personal hygiene without assistive devices." (*Id.*)

91. Regarding his arm immobility, Dr. Blake found "a highly unusual pattern of joint fixation and immobility affecting the bilateral elbows and wrists; both of these joints are in a fixed position which significantly limits the use of the extremities. Neither of the arms can be extended." (*Id.*)  Dr. Blake identified factors that indicated these conditions were not faked: they are consistent with her 2021 findings and the "distribution of the joint involvement having a common medical predilection for proximal involvement." (*Id.* at 6). In conclusion, Dr. Blake found that "it is clear that he has significantly reduced range of motion in multiple joints, particularly elbows and wrists. He is not able to lay his arms flat."  Additionally, "his difficulty in ambulation, arising from a chair, and moving his arms indicates that Mr. Barbee does not pose any risk of danger to others." *(Id.)*

**v. TDCJ has refused to disclose what, if any, contingency measures will be taken to avoid torturing Mr. Barbee on the gurney.**

92. As recounted *supra*, at Mr. Barbee's July 7, 2021 meeting with the Polunsky Unit Warden, Mr. Barbee was not told whether he would be executed in the normal manner with arms outstretched on the gurney, which would cause intolerable pain and suffering.

93. Undersigned counsel also inquired as to whether TDCJ was planning any measures to avoid the pain and suffering an arms-outstretched execution would entail. On September 9, 2021

undersigned counsel e-mailed a letter to TDCJ General Counsel Ms. Kristen Worman. (Appendix 6). In that letter, Mr. Barbee's counsel requested information as to:

1) whether accommodations have been made or are planned to be made to the gurney that would not involve having his arms stretched out straight at his sides, in a cross-like position

2) whether the arms of the gurney are moveable or adjustable so as to allow for bent-arms

3) whether the execution can proceed without having Mr. Barbee's arms in a palms-up position

4) whether the intravenous injection can be delivered from a spot other than his wrist

5) whether the execution team at the Polunsky Unit have been made aware of the physical limitations of Mr. Barbee regarding his planned execution.

(Appendix 6, letter of A. Richard Ellis to Kristen Worman, General Counsel for TDCJ.

94. On September 16, 2021, undersigned counsel received a response from Ms. Amy Lee, Project Coordinator, Office of the General Counsel, TDCJ. (Appendix 7). In that response, Ms. Lee stated

> The Texas Department of Criminal Justice (TDCJ) received your correspondence dated September 9, 2021 inquiring about whether any measures have been taken or planned to be taken regarding Mr. Barbee's long-standing arm immobility issues...any concerns or complaints related to health-related matters or other confinement issues within the DCJ's control are addressed by following the process as outlined in the Grievance Procedures for Offenders section of the TDCJ Offender Orientation Handbook. Mr. Barbee will need to follow the procedures as outlined for the TDCJ to aptly provide a response.
> E-mail response of September 26, 2021, Ms. Amy Lee, Project Coordinator, Office of the General Counsel, TDCJ. (Appendix 7).

95. Despite acknowledgment of their knowledge of Mr Barbee's "long-standing arm immobility issues," and many previous attempts to bring this issue to their attention over many years,

TDCJ was still unwilling to provide any information or guidance as to how they were going to deal with this issue.

96. In accordance with the procedures outlined in the Offender Orientation Handbook, on July 9, 2021 Mr. Barbee submitted a Step 1 Offender Grievance stating "I can not extend my arms straight out with my palms up or down, If my arms are forced to be straightened out in any way, it will cause extreme pain and suffering because I lack the range of motion in both arms...Something would break or tear if my arms were to be forced straight out...I've been trying for years for medical to give me medical to help me with this issue." (Appendix 8). On September 15, 2021, Mr. Barbee again prepared and submitted a Step 1 Offender Grievance Form, stating the same problems. (*Id.*). On September 28, 2021 Mr. Barbee submitted yet another grievance on Sept. 29, 2021, this time a Step 2 grievance, stating that nothing had been done on the earlier grievances regarding his arms. (*Id.*). A review of the grievance dated Oct. 14, 2021 merely stated that Barbee had been given appropriate medical attention. (*Id.*) On March 16, 2022, Mr. Barbee submitted yet another Step 1 grievance, stating that he "cannot extend [his] arms straight on the gurney or with my palms-up position," and asked what accommodations would be made to avoid extreme pain, (*Id.*) On September 9, 2022 Mr. Barbee submitted a Step 2 grievance stating that his previous Step I grievances were not resolved and he had still no explanation as to how his arms were to be strapped down at his execution. (*Id.*)

## CLAIMS FOR RELIEF

**Count One**: **Due to Mr. Barbee's medical conditions and arm immobility issues, attempting to execute him with arms outstretched on the gurney would violate the "cruel and unusual" clause of the Eighth Amendment.**

97. Mr. Barbee incorporates by reference each and every statement and allegation set forth in this complaint as if fully set forth herein.

98. The combination of Mr. Barbee's unique medical conditions discussed *supra* and TDCJ's normal execution procedures show that his execution without ameliorative measures creates a sure or very likely risk of serious pain and needless suffering.

99. To bring an Eighth Amendment challenge to one's conditions of confinement, a plaintiff must allege specific facts supporting the elements of such a claim. An Eighth Amendment claim must allege facts showing that the Plaintiff is incarcerated under conditions posing a substantial risk of serious harm, *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In addition, a plaintiff must allege facts showing that prison officials' "acts or omissions [were or will be] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976)). Mr. Barbee has done that *supra.*

100. Mr. Barbee is requesting a preliminary injunction preventing his execution unless he is allowed to be on the gurney with bent arms and in a position that will not compromise his arm immobility issues discussed *supra*. A preliminary injunction is an "extraordinary remedy" requiring courts to assess four factors: (1) the likelihood of the plaintiff's success on the merits, (2) the threat of irreparable harm to the plaintiff absent an injunction, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *John Doe Co. v. Consumer Fin. Prot. Bureau,* 849 F.3d 1129, 1131 (D.C. Cir. 2017). "[A] strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011). It has been suggested, however, that a movant's showing regarding success on the merits "is an independent, free-standing requirement for a preliminary injunction." *Id.* at 393

(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh,

J., concurring)).[29]

### A. Likelihood of Success on the Merits

101. A Plaintiff bringing an Eighth Amendment challenge to a method of execution must

demonstrate that the proposed execution plans present a "substantial risk of serious harm," and must

identify an alternative method of execution that will significantly reduce the risk of serious pain and

that is feasible and readily implemented. *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze*

*v. Rees*, 553 U.S. 35, 50  (2008)); *see also Bucklew v. Precythe*, 139 S.  Ct. 1112, 1129  (2019)

(confirming  that  "anyone  bringing  a  method  of  execution  claim  alleging  the  infliction  of

unconstitutionally cruel pain must meet the *Baze-Glossip* test.").

102. Mr. Barbee easily meets these requirements, as he has shown *supra* that forcing him to

lie on the gurney with his arms outstretched and with palms up would amount to torture and it is

unconstitutional  to  inflict  needless  torture  on  a  prisoner.  A  simple  alternative  method  is  also

available and is requested by Mr. Barbee: modifications to normal procedures that would allow him

to lie on the gurney with arms bent and not outstretched.  This alternative would pose no substantial

harm or disruption to the execution process.

### B.  Substantial Risk of Serious Harm

103. In order to succeed on his Eighth Amendment claim, Barbee must show that his

---

[29]  Last year, in a religious rights lawsuit, this district court found that Mr. Barbee had met
the conditions for a stay under *Nken v. Holder*, 556 U.S. 418, 434 (2009). *Barbee v. Collier et. al*,
566 F. Supp.3d 726, 734-738 (S.D. Tex 2021).  As the Court observed, "the earlier stay order has
already found that Barbee has met the preliminary requirements for an injunction" (Docket No. 36,
Order at 3) as the requirements for a stay are virtually identical to those for a preliminary injunction.

execution presents a risk of severe pain that is "sure or very likely to cause serious illness and needless suffering" and gives rise to "sufficiently imminent dangers," such that prison officials cannot later plead "that they were subjectively blameless." *Baze*, 553 U.S. at 49–50  (citations omitted).

104. Mr. Barbee's circumstances are unique, and thus, there are specific risks unique to him that TDCJ has not encountered before. The evidence shows that attempting to execute Mr. Barbee per the normal procedures presents more than a "risk" of serious pain and suffering—it is a near certainty. Therefore, attempting to execute Mr. Barbee using TDCJ's usual procedures will violate his Eighth and Fourteenth Amendment rights. Moreover, because TDCJ has refused to provide any information as to the procedures it intends to use, as applied to Mr. Barbee it violates his right of access to the courts and right to petition for redress of grievances under the First and Fourteenth Amendments to the United States Constitution.

**C. The Balance of Equities and the Public Interest**.

105. These factors also favor Mr. Barbee, as the relief he is requesting involves only minor ameliorative measures as opposed to the likelihood of torture if none are taken, and it is in the public interest to carry out executions in a humane manner without the needless infliction of pain. This lawsuit is entirely the result of TDCJ's refusal to communicate their intent as to the execution procedures.

106. Mr. Barbee asks that the Court stay his November 16, 2022  execution date, and enjoin TDCJ from executing him in a manner that would amount to torture, as discussed *supra*. In the absence of such an Order, Mr. Barbee will suffer irreparable injury; namely, the loss of rights and freedoms guaranteed by the United States Constitution and an inhumane death. As the Supreme

Court noted in *Baze v. Rees*, 553 U.S. 36 (2008) "'[P]unishments are cruel when they involve torture or a lingering death . . . .'" 553 U.S. at 49. This premise was first stated over a century ago in *In re Kemmler*, 136 U.S. 436, 447 (1890). In effect, some methods of executions are unconstitutional per se. An execution violates the Eighth Amendment when it poses a risks that are "'sure or very likely to cause serious illness and needless suffering,' and give rise to sufficiently imminent dangers.'" *See Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015) (quoting *Baze v. Rees*, 553 U.S. 36, 50 (2008); *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)).

107.  Mr. Barbee does not raise a facial challenge to the execution protocol or procedures. Instead, he argues that the execution procedure *as applied to him* would be unconstitutional. After the execution date was set, Mr. Barbee's counsel worked diligently to bring this as-applied claim as soon as possible. Because this challenge is premised on Mr. Barbee's current medical conditions, his current medical records needed to be gathered and reviewed by the expert Dr. Blake, and she then had to produce her opinions before counsel could move forward with litigation. Mr. Barbee or his counsel have no control over how long it takes medical providers to produce medical records. TDCJ's long-standing refusal to accommodate or provide information as to their procedures has been the main cause of any delay.

108.  Mr. Barbee's claim is rooted in his unique constellation of medical conditions and the risks posed specifically to him by mainly his arm immobility issues. He does not seek a judgment that would require Texas to alter its execution protocol or procedures for any other inmate. Nothing about his claim questions the lawfulness of capital punishment itself.

109.  Moreover, nothing about Mr. Barbee's claim seeks to "transform courts into boards of inquiry charged with determining 'best practices' for executions." *Baze*, 553 U.S. at 51 (plurality

opinion). Because only Mr. Barbee's execution is at stake, his claim does not ask the Court to

displace state officials from their task as designers of a state's protocol or procedures for carrying

out capital punishment. Instead, the Court should remain focused on a task for which it is well

suited: evaluating whether a general state procedure (the state's normal execution procedures)

applied to particular facts (the medical condition of the inmate) satisfies the Constitution's legal

standard (the Eighth Amendment's prohibition of cruelty).

110. A state must take into account a particular inmate's existing physical disability or health

condition when assessing the propriety of its execution method. Mr. Barbee has shown that his arm

immobility issues are incompatible with a humane execution and that the state's current procedure

will prevent the state from executing him in a constitutional manner. The Court should issue an order

preventing TDCJ from using their normal execution procedures on Mr. Barbee. Such a judgment

would leave Texas free to design an ameliorative procedure that meets Eighth Amendment standards.

**Count Two**: **Executing Mr. Barbee Without Accommodations For His Disabilities Would be a Violation of the Americans with Disabilities Act.**

111. Mr. Barbee incorporates by reference each and every statement and allegation set forth

in this complaint as if fully set forth herein.

112. Mr. Barbee also brings this complaint and moves for a preliminary injunction under the

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. To have Article III standing under the

ADA, a plaintiff must show (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560–61 (1992). Mr. Barbee, the party invoking federal jurisdiction, bears

the burden of establishing each of these elements. *See id.* at 561.  At the pleading stage, general

factual allegations of injury resulting from the defendant's conduct may suffice to establish standing

because "we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. But Mr. Barbee's allegation go far beyond the general, as shown *supra*.

113. To establish injury in fact, a plaintiff must show that he suffered or will suffer "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. (internal quotation marks omitted). An injury is particularized when it "affects the plaintiff in a personal and individual way," and concrete if it is "real, and not abstract." *Sierra*, 996 F.3d at 1113. In the context of a preliminary injunction, a plaintiff must adequately demonstrate "that a future injury is imminent." *Id.* (emphasis omitted). This entails a showing "that there is a sufficient likelihood that [the plaintiff] will be affected by the allegedly unlawful conduct in the future." *Id.*

114. At this stage of the proceedings, Mr. Barbee has demonstrated an imminent injury in fact in that injury is imminent because his execution is set to take place by a needlessly more painful method than necessary. *Cf. Baze v. Rees*, 553 U.S. 35, 53 (2008)

115. Causation requires Mr. Barbee to show that his injury (the impending execution with arms outstretched on the gurney) is "fairly traceable" to the challenged action (i.e., the failure of the defendants to offer him a reasonable accommodation as required by the ADA). *See California v. Texas*, ⸺ U.S. ⸺, 141 S. Ct. 2104, 2113–14 (2021); *Lujan*, 504 U.S. at 560. Mr. Barbee has sufficiently established causation because the defendants' failure to offer him a reasonable accommodation under the ADA for ameliorative measures not requiring him to be on the gurney with his arms at a 180 degree angle. In addition, Mr. Barbee showed that he is a qualified individual with a disability, i.e., arm immobility.

-34-

116. The third and final element is redressability. Redressability under the ADA simply requires a plaintiff to seek a "remedy that is likely to redress [the] injury" which is fairly traceable to the challenged conduct. *See Uzuegbunam v. Preczewski*, ⸺ U.S. ⸺, 141 S. Ct. 792, 797 (2021).  Mr. Barbee has successfully established redressability for his claimed injury. He requests that the district court require the defendants not execute him on a gurney requiring that his arms be outstretched at his sides in a 180-degree posture, as is the normal procedure.[30]

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Barbee prays that this Honorable Court:

1. Issue a preliminary injunction forbidding Mr. Barbee's execution unless ameliorative measures are taken that will not require Mr. Barbee to be strapped to the gurney with his arms outstretched in a 180-degree posture.

2. A declaratory judgment that executing Mr. Barbee with arms outstretched in a 180-degree posture would violate his rights under the Eighth and Fourteenth Amendments and the ADA.

3. A preliminary and permanent injunction prohibiting Defendants from executing Mr. Barbee until they permit an alternative method of execution not requiring him to lie on the gurney with his with arms outstretched in a 180-degree posture.

DATED: October 26, 2022

.

---

[30]  In a series of cases, the Fifth Circuit has held that, to establish an ADA claim for failure to provide a reasonable accommodation, a plaintiff must show that the entity knew of his disability and its consequential limitations, either because the plaintiff requested an accommodation *or* because the nature of the limitation was open and obvious. *See, e.g., Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020); *Windham v. Harris Cnty.*, 875 F.3d 229, 236–37 (5th Cir. 2017). Mr. Barbee, in submitting repeated grievances on this issue (Appendix 8), has abundantly shown that TDCJ was both aware and indifferent to his disabilities and his multiple requests for accommodation.

-35-

Respectfully submitted,
*s/s A. Richard Ellis*

_____

A.  Richard Ellis
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
a.r.ellis@att.net

**CERTIFICATE OF ELECTRONIC SERVICE**

I, A. Richard Ellis, do hereby certify that I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court on October 26, 2022.  I have also served Defendants' counsel of record, Mr. Stephen Hoffman of the Office of the Attorney General, State of Texas  via e-mail at stephen.hoffman@oag.texas.gov. I have also served Defendant's counsel of record, Ms. Leah O'Leary, Deputy Chief, Law Enforcement Defense Division, Office of the Attorney General of Texas at Leah.OLeary@oag.texas.gov.

*/s/ A. Richard Ellis*
A.  RICHARD ELLIS
Attorney for Plaintiff Stephen Barbee
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
a.r.ellis@att.net