IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN BARBEE, | § | |
| *Plaintiff*, | § | |
| | § | CIV. ACT. NO. 4:22–CV–03684 |
| v. | § | **DEATH PENALTY CASE** |
| | § | |
| BRYAN COLLIER et al., | § | |
| *Defendants*. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF
BARBEE'S MOTION FOR STAY OF EXECUTION
WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*STEPHEN M. HOFFMAN
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711–2548
(512) 936–1400

*Counsel of Record

———————————————

ATTORNEYS FOR DEFENDANTS

———————————————

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iii

RESPONSE IN OPPOSITION TO MOTION FOR STAY ........................... 1

STATEMENT OF THE CASE ..................................................... 5

    I.     Facts of the Crime ............................................... 5

    II.    Facts Relating to Punishment ................................... 10

    III.   Conviction and Postconviction Proceedings ................. 10

ARGUMENT ........................................................................ 14

    I.     Barbee's Dilatoriness Requires the Summary Denial
         of His Stay Motion. ........................................... 14

    II.    Alternatively, the Court Should Deny a Stay Because
         the Equities Do Not Favor Barbee. ......................... 18

         A.    Standard of review ......................................... 18

         B.    Barbee fails to present a substantial case or
               make a strong showing that he is likely to
               succeed on the merits because he is time-barred.
               ................................................................ 20

         C.    Barbee fails to present a substantial case or
               make a strong showing that he is likely to
               succeed on the merits because he has not
               exhausted his administrative remedies ..................... 22

         D.    Barbee has not made a strong showing that he
               will succeed on the merits ................................. 25

             1.    Eighth Amendment ................................. 25

             2.    ADA claim .............................................. 31

         E.    Barbee will not suffer irreparable harm. .................. 34

**F.** **The State and the public have a strong interest in seeing the state court judgment carried out.** ........ 35

**CONCLUSION** .................................................. 37

**CERTIFICATE OF SERVICE** ............................... 39

# TABLE OF AUTHORITIES

**Cases**

*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) .................................................. 30

*Barbee v. Collier*, 566 F. Supp. 3d 726 (S.D. Tex. 2021) ................................. 13

*Barbee v. Davis*, 139 S. Ct. 566 (2018) ............................................................. 11

*Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016) .................................... 10, 11

*Barbee v. Davis*, 728 F. App'x 259 (5th Cir. 2018) ......................................... 10

*Barbee v. State*, AP–75,359, 2008 WL 5160202 (Tex. Crim. App. Dec. 10, 2008) ................................................................................................ 9, 10

*Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015) ................................................................................................ 11

*Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 5123356 (N.D. Tex. Sept. 1, 2015) ................................................................................................ 11

*Barbee v. Tex.*, 142 S. Ct. 258 (2021) ............................................................... 12

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ..................................................... 19, 34

*Barr v. Lee*, 140 S. Ct. 2590 (2020) ...................................................... 4, 25, 26

*Baze v. Rees*, 553 U.S. 35 (2008) ............................................................. passim

*Berry v. Epps*, 506 F.3d 402 (5th Cir. 2007) ................................................... 14

*Bible v. Davis*, 138 S. Ct. 2700 (2018) .............................................................. 2

*Bible v. Davis*, 4:18–CV–1893, 2018 WL 3068804 (S.D. Tex. Jun. 21, 2018)…… .......................................................................................... 2, 14, 37

*Bible v. Davis*, 739 F. App'x 766 (5th Cir. 2018) ............................. 2, 14, 22, 35

*Booth v. Churner*, 532 U.S. 731 (2001) ........................................................... 23

*Brown v. Livingston*, 457 F.3d 390 (5th Cir. 2006) .......................................... 14

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019)................................................passim

*Buxton v. Collins*, 925 F.2d 816 (5th Cir. 1991) ............................................... 20

*Cadena v. El Paso Cnty.*, 946 F.3d 717 (5th Cir. 2020) ................................... 31

*Calderon v. Thompson*, 52 U.S. 538 (1998) ......................................... 19, 35, 36

*Crutsinger v. Davis*, 936 F.3d 265 (5th Cir. 2019) ........................................... 36

*Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010) ................................................ 24

*Dunn v. Ray*, 139 S. Ct. 661 (2019) .................................................................... 4

*Ex parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App. 2021) ........................ 12, 13

*Ex parte Barbee*, No. WR–71,070–01, 2009 WL 82360 (Tex. Crim. App. Jan. 14, 2009) ................................................................................ 10

*Ex parte Barbee*, No. WR–71,070–02, 2011 WL 4071985 (Tex. Crim. App. Sept. 14, 2011).......................................................................... 11

*Ex parte Barbee*, No. WR–71,070–02, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013) ......................................................................... 10, 11

*Ex parte Barbee*, No. WR–71,070–03, 2019 WL 4621237 (Tex. Crim. App. Sept. 23, 2019)......................................................................... 12

*Ex parte Barbee*, No. WR–71,070–04, 2021 WL 4713629 (Tex. Crim. App. Oct. 8, 2021) ......................................................................... 12, 16

*Fegans v. Johnson*, No. H–09–4019, 2010 WL 1425766 (S.D. Tex. Apr. 8, 2010) ................................................................................ 23

*Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) ........................................................................ 31

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) ................................ 22

iv

*Garcia v. Castillo*, 431 F. App'x 350 (5th Cir. 2011) ....................................... 20

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) ..................................................... 30

*Gomez v. United States Dist. Court*, 503 U.S. 653 (1992) ............................... 36

*Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012) ................................................ 23

*Harris v. Johnson*, 376 F.3d 414 (5th Cir. 2004) ...................................... 14, 18

*Herrera v. Collins*, 506 U.S. 390 (1993) ........................................................... 19

*Hill v. McDonough*, 547 U.S. 573 (2006) ....................................... 4, 14, 18, 37

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ....................................................... 20

*Jones v. Bock*, 549 U.S. 199 (2007) ................................................................... 23

*Kerr v. Thaler*, 384 F. App'x 400 (5th Cir. 2010) ........................................... 27

*Kincy v. Livingston*, 173 F. App'x 341 (5th Cir. 2006) ................................... 15

*Martel v. Clair*, 565 U.S. 648 (2012) ......................................................... 17, 36

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004) .............. 31

*Montgomery v. Barr*, 507 F. Supp. 3d 711 (N.D. Tex. 2020) ........................... 33

*Moye v. Clerk, Dekalb Cnty. Superior Court*, 474 F.2d 1275 (5th Cir. 1973) . 29

*Nelson v. Campbell*, 541 U.S. 637 (2004) ...................................... 15, 19, 23, 35

*Neville v. Johnson*, 440 F.3d 221 (5th Cir. 2006) ............................................ 14

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................ 20

*Norton v. Enns*, 2:14-CV-0040, 2014 WL 3947158 (N.D. Tex. Aug. 12, 2014) 29

*Ochoa v. Collier*, 802 F. App'x 101 (5th Cir.) .................................................... 34

*Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010) ............................................ 26

*Ramirez v. Collier*, 142 S. Ct. 1264 (2022)................................................. 23, 24

*Reese v. Livingston*, 453 F.3d 289 (5th Cir. 2006) ............................................ 14

*Rhines v. Weber*, 544 U.S. 269 (2005) ............................................................. 36

*Ringo v. Lombardi*, 677 F.3d 793 (8th Cir. 2012) ............................................ 26

*Rivas v. Thaler*, 432 F. App'x 395 (5th Cir. 2011)........................................... 27

*Ross v. Blake*, 136 S. Ct. 1850 (2016)................................................................ 23

*Sells v. Livingston*, 561 F. App'x 342 (5th Cir. 2014)...................................... 20

*Sells v. Livingston*, 750 F.3d 478 (5th Cir. 2014) ............................................ 21

*Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013) ........................................... 26

*Smith v. Johnson*, 440 F.3d 262 (5th Cir. 2006) .............................................. 14

*Swearingen v. Collier*, 4:19–CV–3079, 2019 WL 3935285 (S.D. Tex. Aug. 20, 2019) ................................................................................................................ 21

*Thorson v. Epps*, 701 F.3d 444 (5th Cir. 2012)................................................. 26

*United States v. Vialva*, 976 F.3d 458 (5th Cir. 2020) ..................................... 36

*Walker v. Epps*, 550 F.3d 407 (5th Cir. 2008) ................................................. 21

*Waters v. Texas*, 747 F. App'x 259 (5th Cir. 2019) ......................................... 30

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017) ........................................... 21

*Whitaker v. Livingston*, 597 F. App'x 771 (5th Cir. 2015) .................. 15, 16, 17

*Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013)..................................... 30

*White v. Johnson*, 429 F.3d 572 (5th Cir. 2005) .............................................. 14

*Wilkins v. Davis*, 832 F.3d 547 (5th Cir. 2016) ............................................... 17

*Windham v. Harris Cnty., Tex.*, 875 F.3d 229 (5th Cir. 2017) ........................ 32

*Wood v. Collier*, 836 F.3d 534 (5th Cir. 2016) ................................................. 26

*Woodford v. Ngo*, 548 U.S. 81 (2006) .............................................................. 23

*Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001) ................................... 24

## Statutes

18 U.S.C. § 3599 ............................................................................................... 17

18 U.S.C. § 3599(e) ........................................................................................... 17

18 U.S.C. § 3626(a)(1)(A) ................................................................................ 30

28 U.S.C. § 2253 ............................................................................................... 19

42 U.S.C. § 1983 .........................................................................................passim

42 U.S.C. § 1997e .............................................................................................. 22

42 U.S.C. § 1997e(a) ......................................................................................... 23

Tex. Gov't Code § 501.008 ............................................................................... 24

Tex. Pen. Code § 19.03(a)(7)(A) ........................................................................ 5

## Other Authorities

TDCJ, Death Row Information. Available at:
    https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html (last
    accessed Oct. 31, 2022). ............................................................................. 2

The Americans with Disabilities Act ........................................................passim

The Prison Litigation Reform Act ................................................. 22, 23, 25, 30

The Religious Land Use and Institutionalized Persons Act of 2000 .............. 12

## RESPONSE IN OPPOSITION TO MOTION FOR STAY

Barbee murdered his pregnant ex-girlfriend and her seven-year-old son by suffocating them to death. Barbee confessed multiple times to killing the victims, had a motive to commit the crime, was caught burying the bodies, and led the police to where the bodies were buried. Pursuant to the order of the trial court, Barbee is scheduled to be executed sometime after 6:00 P.M. on November 16, 2022. Barbee has already availed himself of all the state and federal appeals available to death-row inmates in Texas—plus two subsequent state writ proceedings and another § 1983 suit challenging the prison's spiritual advisor policies. This is Barbee's *third* execution date.

A mere twenty-two days before his execution, Barbee filed yet another federal civil rights lawsuit. ECF No. 1. In his complaint, Barbee claims that, because of his physical ailments, executing him would constitute cruel and unusual punishment and violate the Americans with Disabilities Act (ADA). Complaint Pursuant to 42 U.S.C. § 1983 (Compl.), ECF No. 1. He also moves for a stay of execution. Motion for Stay of Execution (Mot. Stay), ECF No. 4.

However, no stay of execution is warranted. Barbee's lawsuit is dilatory. Barbee's purported physical ailments are longstanding—allegedly dating back fifteen years. Compl. at 9, ECF No. 1. Barbee offers no compelling excuse for waiting until now, in last-minute litigation, to finally bring his claims. Therefore, the Court should deny a stay pursuant to District, Circuit, and

Supreme Court precedent. This Court, the Fifth Circuit, and the Supreme Court have all denied a stay in similar circumstances to a plaintiff who made a dilatory, as-applied challenge to the prison's lethal injection protocol for reasons of ill health. *Bible v. Davis*, 4:18–CV–1893, 2018 WL 3068804 (S.D. Tex. Jun. 21, 2018) (Hoyt, J.), *aff'd*, 739 F. App'x 766 (5th Cir. 2018), *cert. and stay denied* 138 S. Ct. 2700 (2018). The Court should do the same here.

But even if his lawsuit was timely, Barbee fails to show any entitlement to a stay. He is not likely to succeed on the merits for several reasons. First, Barbee is time-barred under the relevant statute of limitations. Second, Barbee failed to exhaust his administrative remedies, thereby precluding any relief on the merits. Finally, while Barbee offers ample discussion of his physical infirmities, he provides no evidence that the prison cannot accommodate those infirmities during his execution. Indeed, he seems to rely entirely on a picture of the execution chamber for this point. Barbee has not presented even a single instance of the Defendants failing to successfully execute an offender under similar circumstances. Barbee provides no example of any Texas execution, performed under the current protocol, gone awry. TDCJ's staff are experienced and demonstrably competent[1], with a long track

---

[1]     The TDCJ's website lists 576 executions carried out since 1982. TDCJ, Death Row Information. Available at: https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html (last accessed Oct. 31, 2022).

record in this area. The Defendants have indicated through the grievance process that they will be able to accommodate Barbee's infirmities, and the execution protocol gives the prison staff wide discretion to perform an execution safely and humanely. As explained below, the Defendants have submitted an affidavit from the Huntsville Senior Warden explaining that the gurney can accommodate Barbee's mobility issues. That said, there is no constitutional right to a point-by-point breakdown of how each individual's execution will be conducted. And, at bottom, Barbee's assertion that he will experience unnecessary or undue pain is mere speculation. The courts have held that isolated and speculative failures of the lethal-injection protocol will not justify relief, and that is precisely what Barbee is proposing as a basis for relief.

Moreover, Barbee cannot show irreparable harm. This is a § 1983 action, so Barbee necessarily does not challenge the fact that he is being put to death (if so, his suit would sound in habeas). Rather, the only harm that can be considered is that he *may* experience some pain during the execution protocol. But, as shown below, the Supreme Court has held that the Constitution does not require a painless execution, and some pain is attendant to all executions.

And even if the Court does not agree that Barbee's dilatoriness presents an independent barrier to relief, that dilatoriness must still be considered in

3

the weighing of the equities, and it cuts against Barbee. The suffering of the victims and their long wait for justice permits no further delays in the matter.

Barbee has the burden of persuasion on his stay request, and he is required to make "a clear showing" that he is entitled to a stay of execution. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "Last-minute stays should be the extreme exception, not the norm[.]" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019); *see also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020). As the Supreme Court has explained:

> "[T]he last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay." *Hill*, 547 U.S. at 584 (internal quotation marks omitted). So, for example, we have vacated a stay entered by a lower court as an abuse of discretion where the inmate waited to bring an available claim until just 10 days before his scheduled execution for a murder he had committed 24 years earlier. *See* [*Ray*, 139 S. Ct. at 661]. If litigation is allowed to proceed, federal courts "can and should" protect settled state judgments from "undue interference" by invoking their "equitable powers" to dismiss or curtail suits that are pursued in a "dilatory" fashion or based on "speculative" theories. [*Hill*, 547 U.S. at 584–85].

*Bucklew*, 139 S. Ct. at 1134 (footnote omitted).

Barbee fails to make the requisite showing to justify interference by the federal courts. More than seventeen years have passed since Barbee brutally murdered his victims. The ensuing delay in carrying out Barbee's sentence should weigh heavily in the evaluation of this stay application, and justice for Barbee's victims should be denied no longer. Simply put, "[t]he people of

[Texas], the surviving victims of Mr. [Barbee]'s crimes, and others like them deserve better." *Id*. at 1134. Accordingly, Barbee's request for a stay should be denied.

## STATEMENT OF THE CASE

### I.    Facts of the Crime

The Texas Court of Criminal Appeals (CCA) provided the following summary of Barbee's crimes:

> [Barbee] was charged with murdering Lisa Underwood and her seven-year-old son, Jayden Underwood, during the same criminal transaction. Tex. Pen. Code § 19.03(a)(7)(A). Lisa owned a bagel shop in Fort Worth with her friend Holly Pils. Pils testified that [Barbee], who was married, had been a customer at the bagel shop and that he and Lisa began a personal relationship in Fall 2003. They stopped seeing each other at the end of 2003, and Lisa began dating another man at the beginning of 2004. She was still dating the other man when she resumed her relationship with [Barbee] in July 2004, and she became pregnant around that time. She informed both men that she was pregnant but told [Barbee] that she believed he was the father of the unborn child. She told Pils that she wanted her baby to have health insurance and that she had discussed the matter with [Barbee].

> Pils testified that Lisa, who was more than seven months pregnant, stayed home from work on Friday, February 18, 2005, because she had a cold. Pils planned to host a baby shower for Lisa at the bagel shop the next day. Lisa told Pils that she was feeling better, that she was excited about the baby shower, and that she planned to arrive at the bagel shop shortly before 4:00 p.m. on Saturday, February 19th.

> At approximately 3:00 on Saturday morning, Denton County Deputy Sheriff David Brawner saw a man walking along the service road of Interstate Highway 35. Brawner stopped his patrol car behind the man and activated his overhead emergency lights

and his "in-car video camera system." It was cold outside, and it had been raining. Brawner testified that the man's clothes were "very wet" and that he was "covered in mud." When Brawner asked the man for identification, he said that he had left his wallet at his friend's residence nearby. He gave the officer a false name and date of birth and "took off running on foot" when Brawner spoke with dispatch in an effort to verify the information. Brawner ran after the man, but he disappeared into a thickly wooded area. Brawner and other officers searched the area for hours but were unable to locate the man. Brawner later identified the man as [Barbee] in a photo spread.

The police were contacted after Lisa failed to show up for her baby shower later that day. There were no signs of forced entry at Lisa's house. Jayden's shoes were on top of the fireplace hearth, and his glasses had been left next to his bed. There was blood in the living room on the entertainment center, the walls, and a fitted couch cover. It appeared that someone had attempted to clean and conceal a saturation blood stain on the living room floor. Lisa's car was gone, and there was blood on the floor in the garage. Lisa's DNA profile was consistent with the blood stains in the house and the garage. Her personal home computer showed that she logged on to the internet at 11:22 p.m. on February 18 and logged off at 12:02 a.m. on February 19. The last website she visited was "birthplan.com."

On February 21, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Officer Brawner had encountered [Barbee] two days earlier. The front end of the vehicle was submerged in the creek. The windows were down and the hatchback was up. There was a bottle of cleaning solution in the cargo area of the vehicle. Lisa's car keys and purse were located nearby.

On the same day that Lisa's car was found, Detectives Michel Carroll, John McCaskell, and Brian Jamison of the Fort Worth Police Department traveled to Tyler to speak with [Barbee], his wife Trish Barbee, and his co-worker Ron Dodd. The detectives initially talked to them in the parking lot of a Wal–Mart, but later asked them to come to the Tyler Police Department for further questioning. At the police department, Carroll and Jamison

6

interviewed [Barbee] in one room, and McCaskell interviewed Dodd in another room. [Barbee] received his *Miranda* warnings and his interview began at about 7:45 p.m. In this interview, which was recorded on a digital video disc (DVD), [Barbee] said that he worked cutting down trees in Tyler during the day on February 19. He said that he drove to his home in Fort Worth that evening and that he went over to Dodd's house later that night to work on the truck that they used as their business vehicle. He left Dodd's house at around 2:00 or 3:00 a.m. It took over an hour for him to drive home because the truck was "sputtering" and "leaking oil." His wife was asleep when he arrived home, and he slept on the couch so he would not wake her. He acknowledged that he had dated Lisa and that she had informed him he might be the father of her unborn child, but he claimed that he had not seen or heard from her in a while. He eventually acknowledged that he had been stopped by a police officer in Denton County at around 3:00 a.m., that he had given the officer a false name and date of birth, and that he had run away from the officer.

Carroll testified that he excused himself to observe McCaskell's interview with Dodd, then he returned to [Barbee]'s interview room and asked, "Does FM 407 sound familiar to you?" He placed photographs of Lisa and Jayden on the table and walked out of the room, leaving [Barbee] alone. [Barbee] later opened the door and asked to use the men's room. Carroll accompanied him to the bathroom where they had an un-recorded conversation for about forty-five minutes to one hour. Carroll testified that he told [Barbee] that Dodd was "going to lay this whole thing in [Barbee's] lap" and that "Lisa's family needed closure." [Barbee] made comments "about being locked up [for] the rest of his life" and said that he understood the need for closure because he had lost a family member. [Barbee] told Carroll that "he and Dodd actually created a plan to go kill Lisa" because "Lisa wanted to use his name on a birth certificate or she was trying to take money from him, she was going to ruin his family, his relationship with his wife, Trish, and he did not want that to happen." [Barbee] said that he dropped his car off at Dodd's house and then Dodd drove him to Lisa's house. Dodd left, and [Barbee] went inside and tried to "pick a fight" with her. He was unable to provoke a fight, so he called Dodd to pick him up. He later had Dodd take him back to Lisa's house. This time, "he was able to get her upset enough that he

7

could start a fight with her." He wrestled her to the ground and "held her face into the carpet until she stopped breathing." Jayden came into the room and was "crying" and "emotional." [Barbee] said he walked up to Jayden, placed his hand over his mouth and nose, and "held it there until he stopped breathing." Afterwards, [Barbee] "tried to clean up the house" and "tried to cover a blood spot with a piece of furniture." He placed the bodies of Lisa and Jayden into Lisa's car and drove to "a road off of FM 407 where they buried both their bodies." He said that he used a shovel Dodd had given to him and that he buried the bodies in a shallow grave and placed debris on top of it. He then drove Lisa's car to another location and "stopped it just short of the creek." After relating this story, [Barbee] agreed to have another digitally recorded video interview with Carroll.

Carroll testified that he and [Barbee] left the bathroom and went to Detective Richard Cashell's desk where [Barbee] assisted them in mapping out the location where he had buried the victims. They used "MapQuest" to "get a map of that area" and [Barbee] showed them "the roads that he traveled" and where he "put the victims' bodies." Carroll and [Barbee] then went back to the interview room where [Barbee] gave his second digitally recorded video statement shortly after 11:00 p.m.

After Carroll interviewed [Barbee], he left the interview room and spoke with [Barbee]'s wife, Trish Barbee. Carroll told Trish that [Barbee] had confessed to killing Lisa and that he wanted to talk to her. Trish wanted to speak with [Barbee], so Carroll brought her to the interview room. Carroll remained outside, and the digital video recorder continued running as [Barbee] and Trish conversed. Trish asked [Barbee] what happened. [Barbee] explained that Lisa called him and threatened him, so he went to her house and tried to talk to her. He said that Lisa said she would "ruin" him and that she fought with him and kicked him. He explained that he "held her down too long" and that he "didn't mean for her to stop breathing."

Carroll testified that [Barbee] spent that night in the Smith County Jail. The next morning, he rode with Carroll and Officer Mark Thornhill and directed them to the location of the bodies. Carroll testified that [Barbee] stated, "[W]hen I take you to the

8

bodies, I don't want to see the bodies, and I don't want the media to see me." When they got closer to the location, [Barbee] told the officers to take a different exit and "took [them] a back route to the same location." When they arrived, [Barbee] sat in the car and directed them to the grave by yelling out the window. Carroll testified that Dodd had already taken police to "the same area," but that the bodies were not located until [Barbee] arrived. The bodies were located in a shallow grave that had tree limbs placed on top of it.

The medical examiner who performed Lisa's autopsy testified that Lisa suffered facial abrasions and contusions and a broken arm. She had bruises on both sides of her back that could have been caused by being hit or by having "external force applied over a longer period of time." Her injuries were consistent with a person holding her down and stopping her from breathing. The cause of her death was "traumatic asphyxiation," and the manner of her death was homicide. Lisa was pregnant with a healthy female fetus that appeared to be around seven months gestational age. The cause of the fetus' death was "fetal asphyxiation" resulting from "maternal asphyxiation."

The medical examiner who performed Jayden's autopsy testified that Jayden had a large bruise above his right temple that was "due to some sort of impact to the head." He had bruises on his back and abrasions on his back, arm, hip, and leg. He had bruises on his lips and gums that appeared to be "caused by some sort of compression, some object put over the area of the mouth and pressing on the mouth and compressing the lips against the underlying teeth." The medical examiner testified that Jayden's injuries were consistent with: someone placing a hand over Jayden's mouth and nose; someone pressing Jayden's face against a flat surface; or, someone pressing Jayden's face against a surface that "gives if you push against it," like a couch or a carpeted floor. He determined that the cause of Jayden's death was "asphyxia by smothering" and the manner of his death was homicide.

*Barbee v. State*, AP–75,359, 2008 WL 5160202, at *1–3 (Tex. Crim. App. Dec. 10, 2008) (footnotes omitted), *cert. denied*, 558 U.S. 856 (Oct. 5, 2009).

9

## II.     Facts Relating to Punishment

The Fifth Circuit offered the following description of the punishment

evidence:

> At the punishment phase, the State presented testimony
> from Barbee's ex-wife, Theresa Dowling, that Barbee had
> assaulted her during their marriage. Dowling also testified that
> Barbee confessed to her shortly after he confessed to the police.
> The State also presented testimony from a former coworker who
> claimed that Barbee verbally abused her after she refused his
> advances. Barbee presented testimony from friends, family, and
> acquaintances attesting to his good deeds and good character.[2]
> Barbee also presented testimony from a prison security expert who
> testified that Barbee would be able to successfully serve a life
> sentence, a confinement officer who knew Barbee well, and a
> confinement officer who had observed Barbee's good behavior
> while in jail. The jury ultimately sentenced Barbee to death.

*Barbee v. Davis*, 728 F. App'x 259, 260–62 (5th Cir. 2018).

## III.     Conviction and Postconviction Proceedings

Barbee was convicted of capital murder and sentenced to death in 2006.

*State v. Barbee*, No. 1004856R, 2006 WL 6916746 (213th Jud. Dist. Ct., Tarrant

Co., Tex. Feb. 27, 2006). He unsuccessfully sought appellate and state

postconviction relief. *Barbee*, 2008 WL 5160202; *Ex parte Barbee*, No. WR–

71,070–01, 2009 WL 82360 (Tex. Crim. App. Jan. 14, 2009) (per curiam) (not

designated for publication).

---

[2]     Barbee's presentation at the punishment phase is discussed in further detail
in [the Fifth Circuit's] COA opinion. *See Barbee v. Davis*, 660 F. App'x 293, 318–19
(5th Cir. 2016). [footnote in original]

After Barbee filed his federal habeas petition, the district court allowed him to return to state court to raise previously unpresented claims. *Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 4094055, at \*2 (N.D. Tex. July 7, 2015). Barbee then filed a subsequent state habeas application. *Id*. After remanding a claim for a hearing, the CCA denied habeas relief on the remanded claim and dismissed the other claims as abusive. *Ex parte Barbee*, No. WR–71,070–02, 2011 WL 4071985 (Tex. Crim. App. Sept. 14, 2011) (per curiam) (not designated for publication); *Ex parte Barbee*, No. WR–71,070–02, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013) (per curiam) (not designated for publication).

Upon Barbee's return to federal court, the district court denied Barbee habeas relief, denied his application for a certificate of appealability (COA), and denied his motion to alter or amend judgement. *Barbee*, 2015 WL 4094055, at \*67; *Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 5123356 (N.D. Tex. Sept. 1, 2015). Barbee then filed an application for a COA in the Fifth Circuit. The Fifth Circuit granted a COA on one claim. *Barbee*, 660 F. App'x at 300. After subsequent briefing and oral argument, the Fifth Circuit affirmed the denial of habeas relief. *Barbee*, 728 F. App'x at 260–70. The Supreme Court denied certiorari review. *Barbee v. Davis*, 139 S. Ct. 566 (2018).

On May 9, 2019, the 213th Judicial District Court of Tarrant County scheduled Barbee for execution on October 2, 2019. *Ex parte Barbee*, No. WR–

71,070–03, 2019 WL 4621237, at *2 (Tex. Crim. App. Sept. 23, 2019) (per curiam) (not designated for publication). Barbee filed a subsequent state habeas application on August 6, 2019. *Id.* The CCA stayed the execution on September 23, 2019, and ordered briefing. *Id*. On February 10, 2021, the CCA dismissed the application as an abuse of the writ. *Ex parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App), *cert. denied* 142 S. Ct. 258 (2021).

On July 6, 2021, the trial court entered another order setting Barbee's execution for October 12, 2021. Barbee filed a motion to withdraw the execution date. This motion was denied on October 7, 2021. Barbee also filed a subsequent state habeas application and a related motion to stay. *Ex parte Barbee*, No. WR–71,070–04, 2021 WL 4713629 (Tex. Crim. App. Oct. 8, 2021) (per curiam) (not designated for publication). As relevant here, Barbee asserted that his "'well-documented arm immobility and range-of-motion disabilities mean that TDCJ's execution protocol will subject him to cruel and unusual punishment in violation of the Eighth Amendment.'" *Id*. at *1. The CCA dismissed the application as an abuse of the writ and noted that Barbee's Eighth Amendment claim was not cognizable. *Id*.

On September 21, 2021, Barbee filed a lawsuit against TDCJ pursuant to § 1983 and RLUIPA[3], based on TDCJ's denial of his request for his spiritual

_____

[3]    The Religious Land Use and Institutionalized Persons Act of 2000.

advisor to make physical contact with him and audibly pray during his execution. *Barbee v. Collier*, 566 F. Supp. 3d 726 (S.D. Tex. 2021). Barbee sought and received a stay of his October 12th execution. *Id.* at 730.

On August 12, 2022, the trial court issued an order re-setting Barbee's execution date for November 16, 2022. Barbee filed a mandamus action in the CCA on August 19, 2022. Mot. for Leave to File Pet. Mandamus, *Ex parte Barbee*, WR–71,070–05 (Tex. Crim. App.). He also filed a suggestion for the CCA to reconsider on its own motion its decision on his WR–71,070–03 writ (decided by *Ex parte Barbee*, 616 S.W.3d at 836). Both the mandamus action and the suggestion for reconsideration were denied on November 9, 2022 without written order.

Barbee filed his instant lawsuit on October 25, 2022—a mere twenty-two days before his execution date. Compl., ECF No. 1. He filed his motion to stay on November 2, 2022. ECF No. 4. This Court has ordered briefing on issues germane to the case. ECF No. 5. Barbee has responded. ECF No. 6

In the spiritual advisor lawsuit, this Court has entered an injunction prohibiting Barbee's execution unless the prison alters its written policies concerning the behavior of spiritual advisors in the execution chamber. *Prelim. Inj.*, *Barbee v. Collier et al.*, No. 4:21–CV–03077 (S.D. Tex.), ECF No. 41. The Defendants have appealed, and the matter is before the Fifth Circuit.

13

## ARGUMENT

### I.   Barbee's Dilatoriness Requires the Summary Denial of His Stay Motion.

In *Hill*, the Supreme Court stated that "[t]he federal courts can and should protect States from dilatory or speculative suits[.]" 547 U.S. at 585. This Court should heed the Supreme Court's exhortation. Both this Court and the Fifth Circuit have previously endorsed the denial of a stay of execution based solely on a lack of timeliness, independent of other factors, without considering the merits of the underlying claims. *See Bible*, 2018 WL 3068804, at *5 (capital plaintiff's "unnecessary delay in filing suit and seeking equitable relief is an independent basis on which the Court will deny relief"); *Bible*, 739 F. App'x at 770 ("We see no error in the district court's conclusion that [plaintiff]'s suit constitutes a dilatory tactic and therefore warrants no equitable relief."); *see also Berry v. Epps*, 506 F.3d 402, 404–05 (5th Cir. 2007) (per curiam); *White v. Johnson*, 429 F.3d 572, 573–74 (5th Cir. 2005) (per curiam); *Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004) (per curiam); *Brown v. Livingston*, 457 F.3d 390, 391 (5th Cir. 2006); *Smith v. Johnson*, 440 F.3d 262, 263–64 (5th Cir. 2006); *Reese v. Livingston*, 453 F.3d 289, 290–91 (5th Cir. 2006); *Neville v. Johnson*, 440 F.3d 221, 222–23 (5th Cir. 2006) (per curiam). In the lethal-injection context, petitioners who dilatorily raise previously available claims

immediately before their execution are not entitled to a stay regardless of whether they state a cognizable claim under § 1983.

Barbee's plainly dilatory attempts at obtaining a stay of execution are of the type the Supreme Court has cautioned against. *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004). Such dilatory tactics should not be countenanced, and Barbee is not entitled to a stay at this late date. *Id.*; *see Whitaker v. Livingston*, 597 F. App'x 771, 774 (5th Cir. 2015) ("If [plaintiff] were to wait until an execution date was set to file this action, he would be unable to stay the execution under this court's clearly established precedent to pursue these claims.'"); *Kincy v. Livingston*, 173 F. App'x 341, 342–43 (5th Cir. 2006).

Barbee claims that his health issues are longstanding, and he has had three execution settings. *See* Compl. at 9, ECF No. 1 (Barbee's health issues are fifteen years old and have extended through most of his death row residency); *see also* Conviction and Postconviction Proceedings, *supra*. However, Barbee did not file his § 1983 lawsuit raising the instant claim until his current execution date was imminent. Barbee's third execution date (the instant date) was set on August 12, 2022. Barbee could have made his as-applied challenge to the prison's lethal injection protocol then, but he chose not to, waiting until a mere twenty-two days before his execution to file his complaint. Compl., ECF No. 1 (dated October 25, 2022).

15

Barbee's second execution was set for October 12, 2021. Again, Barbee could have contested the prison's execution protocol in federal court at that time, but he chose not to despite raising virtually the same claim in state court. *Ex parte Barbee*, 2021 WL 4713629, at *1. And when Barbee's first execution date was set for October 2, 2019, he did not challenge the execution protocol via § 1983 then either. Indeed, since Barbee states that his medical issues are long-standing—dating back to May 2006, *see* Compl. at 9, ECF No. 1—he could have even brought this action long before any execution date was set. *Whitaker*, 597 F. App'x at 774. Barbee himself states: "Even in 2014, [Barbee] could not extend his arms fully outstretched as they would be on a gurney." Compl. at 14, ECF No. 1. And Barbee's own declaration acknowledges: "It's been like this for years and is getting worse." Appx. 3 at 4, ECF No. 1-1 (ECF page 95).

In his "note regarding timeliness," Barbee asserts that he could not have brought this action earlier because he has lacked appointed counsel since 2019 and because the TDCJ has supposedly hindered his fact-gathering for the last year. Compl. at 7–8, ECF No. 1. But this is demonstrably incorrect. Barbee brought this claim in an abusive state writ before his October 2021 execution date. *Ex parte Barbee*, 2021 WL 4713629, at *1. If Barbee could bring this claim in state court, he could have brought it here, regardless of any alleged interference by TDCJ or lack of counsel. And, given Barbee's assertion that his medical problems are more than a decade old, he could have (and should have)

16

pursued his claims, exhausted them through the grievance process, and brought them in federal court long ago. *Whitaker*, 597 F. App'x at 774.

Moreover, counsel's lack of appointment did not stop Barbee from filing numerous state and federal actions with respect to his current and prior execution dates.[4] *See* Conviction and Postconviction Proceedings, *supra*. It is also worth noting that 18 U.S.C. § 3599 "entitles indigent defendants to the appointment of counsel in capital cases, including habeas corpus proceedings." *Martel v. Clair*, 565 U.S. 648, 652 (2012). Under § 3599, appointed counsel is obligated to continue representing the inmate unless and until a court of competent jurisdiction grants a motion to withdraw. *See Wilkins v. Davis*, 832 F.3d 547, 557–58 (5th Cir. 2016) ("[C]ounsel is authorized—and indeed obligated—to continue representing the defendant until the court permits him to withdraw."). This includes "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedure." 18 U.S.C. § 3599(e). Barbee has not shown that counsel has been relieved of his responsibilities by the competent court.

---

[4]     Barbee is also at least partially represented by the Western District's Capital Habeas Unit (CHU). *Barbee v. Collier et al.*, 4:21–cv–03077 (S.D. Tex.) (spiritual advisor lawsuit docket listing CHU attorney); *Barbee v. Davis*, No. 4:09–cv–00074–Y (N.D. Tex.), ECF No. 102 (appointing CHU for clemency). It is the Defendants' understanding that CHU attorneys are salaried employees whose compensation is not dependent on appointment. The CHU has supplied an investigator in this matter and provided funding for a medical evaluation. Appx. 4, ECF No. 1-1; ECF No. 6 at 7 n.5.

Instead of bringing this suit in a timely manner, Barbee did "the very thing the plaintiff is not entitled to do . . . namely, to wait until his execution is imminent before suing to enjoin the state's method of carrying it out." *Harris*, 376 F.3d at 417 (citation omitted). Specifically,

> [b]y waiting until the execution date was set, [Barbee] left the state with a [Hobson's] choice: It could either accede to [his] demands and execute him in the manner he deems most acceptable, even if the state's methods are not violative of the [Constitution]; or it could defend the validity of its methods on the merits, requiring a stay of execution until the matter could be resolved at trial. Under [Barbee's] scheme, and whatever the state's choice would have been, it would have been the timing of [his] complaint, not its substantive merit, that would have driven the result.

*Id*. "By waiting as long as he did, [Barbee] leaves little doubt that the real purpose behind his claim[s] is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out." *Id*. at 418.

This Court should refuse to countenance this dilatoriness and follow the Supreme Court's direction in *Hill* by denying a stay solely based on lack of timeliness without considering the merits.

## II.  Alternatively, the Court Should Deny a Stay Because the Equities Do Not Favor Barbee.

### A.  Standard of review

"Filing an action that can proceed under § 1983 does not entitle the [plaintiff] to an order staying an execution as a matter of course." *Hill*, 547 U.S. at 584. "It is not available as a matter of right, and equity must be sensitive to

the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* (citing *Nelson*, 541 U.S. at 649–50). "It is well-established" that petitioners on death row must show a "reasonable probability" that the underlying issue is "sufficiently meritorious" to warrant a stay and that failure to grant the stay would result in "irreparable harm." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2). Indeed, "[a]pplications for stays of death sentences are expected to contain the information and materials necessary to make a careful assessment of the merits of the issue and so reliably to determine whether plenary review and a stay are warranted." *Id.* To demonstrate an entitlement to a stay, a petitioner must demonstrate more than "the absence of frivolity" or "good faith" on the part of petitioner. *Id.* at 892–93. Rather, the petitioner must make a substantial showing of the denial of a federal right. *Id.* In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself suffice." *Id.* at 893. The State's "powerful and legitimate interest in punishing the guilty," as well as its interest in finality, must also be considered, especially in a case such as this where the State and victims have for years borne the "significant costs of federal habeas review." *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring); *Calderon v. Thompson*, 523 U.S. 538, 556

19

(1998) (both the State and the victims of crime have an important interest in the timely enforcement of a sentence).

Thus, in deciding whether to grant a stay of execution, the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir. 1991). "In a capital case, the movant is not always required to show a probability of success on the merits, but he must present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities[,] i.e., the other three factors[,] weighs heavily in favor of granting a stay." *Garcia v. Castillo*, 431 F. App'x 350, 355 (5th Cir. 2011) (cleaned up); *see Sells v. Livingston*, 561 F. App'x 342, 344 (5th Cir. 2014).

## B.     Barbee fails to present a substantial case or make a strong showing that he is likely to succeed on the merits because he is time-barred.

The Fifth Circuit holds that a statute of limitations applies to § 1983 method-of-execution challenges, and such attacks are appropriately filed either after a plaintiff's conviction and sentence become final on direct review, or the

20

date that an execution protocol change becomes effective. *See Walker v. Epps*, 550 F.3d 407, 411–15 (5th Cir. 2008). Because § 1983 has no statute of limitation, Texas' two-year statute for personal-injury actions governs this challenge. *Whitaker v. Collier*, 862 F.3d 490, 494 (5th Cir. 2017). In this case, the statute of limitations began to run on the later of the two relevant dates— when the protocol changed July 9, 2012, *see Sells v. Livingston*, 750 F.3d 478, 480–81 (5th Cir. 2014)—and expired on July 9, 2014. Consequently, even if he were to file under § 1983, Barbee's time for seeking relief on this claim has already expired. *See*, *e.g.*, *Swearingen v. Collier*, 4:19–CV–3079, 2019 WL 3935285, at *4 n.8 (S.D. Tex. Aug. 20, 2019) ("The defendants convincingly argue that Swearingen's claims are time-barred. A two-year limitations period exists for the relevant portions of Texas' protocol. Despite recent changes to an unrelated portion of the Texas protocol, the core issues at play have been available to Swearingen since 2012, at least.").

Moreover, even if the Court were to consider Barbee's challenge "as applied" and view onset of his mobility issues as starting the statute-of-limitations clock, his claims are nevertheless time-barred. As explained above, Barbee has detailed health problems dating back to 2006, and even admits that "in 2014, [Barbee] could not extend his arms fully outstretched as they would be on a gurney." Compl. at 14, ECF No. 1. He states in his own declaration that his arms have been a problem for years. Appx. 3 at 4, ECF No. 1-1 (ECF page

95). In short, Barbee's medical conditions are longstanding. Barbee's claims are time-barred on their face—even if the Court construes his lethal-injection challenge as "as applied" and such "as applied" claims benefit from a different statute of limitations than facial challenges. *See*, *e.g.*, *Bible*, 739 F. App'x at 772 ("this court has found claims similar to [Plaintiff's] to be subject to the statute of limitations").

Likewise, claims brought under the ADA are subject to the state's personal injury statute of limitations. *Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011) (en banc) (applying the two-year Texas personal-injury limitations period for claims under Title II of the ADA). As shown above, Barbee has been aware of his asserted disability and limitations for much longer than two years. The resetting of his execution date does not reset the statute of limitations for challenges to the method of execution. Accordingly, both Barbee's Eighth Amendment and ADA claims are time-barred.

### C. Barbee fails to present a substantial case or make a strong showing that he is likely to succeed on the merits because he has not exhausted his administrative remedies.

Section 1997(e) of the PLRA[5] provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

---

[5]     The Prison Litigation Reform Act.

facility until such administrative remedies as are available are exhausted."
42 U.S.C. § 1997e(a); *see also Ramirez v. Collier*, 142 S. Ct. 1264, 1275–76
(2022). Exhaustion is *mandatory* "irrespective of the forms of relief sought and
offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 739–
40 n.6 (2001); *see Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) ("[T]here
can be no doubt that pre-filing exhaustion of [the] prison grievance processes
is mandatory.") (citing *Woodford v. Ngo*, 548 U.S. 81 (2006) & *Jones v. Bock*,
549 U.S. 199 (2007)). The PLRA's exhaustion requirement applies to Barbee's
challenge to TDCJ's execution procedure. *See Nelson*, 541 U.S. at 643, 650
(concluding that a prisoner's complaint about the procedure used to find a vein
during the execution process was a § 1983 civil rights complaint and subject to
the PLRA exhaustion requirement); *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016)
("Courts may not engraft an unwritten 'special circumstances' exception onto
the PLRA's exhaustion requirement.").

Barbee's counsel's email correspondence with TDCJ General Counsel,
*see* Pl. Appx. 6 & 7, ECF No. 1-1, did not satisfy the mandatory exhaustion
requirement under PLRA. *See, e.g., Fegans v. Johnson*, No. H–09–4019, 2010
WL 1425766, at *13 (S.D. Tex. Apr. 8, 2010) (concluding that a prisoner's
attorney sending a notice of claims did not satisfy the PLRA exhaustion
requirement). Barbee may only exhaust via TDCJ's grievance process, as
reflected by TDCJ's response to Barbee's counsel. *Id.*; Tex. Gov't Code

§ 501.008; *see Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion."). And to properly exhaust, a prisoner must "pursue the grievance remedy to conclusion." *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). This requires completion of both steps of TDCJ's grievance process before a complaint may be filed. *Id.*; *see also Ramirez*, 142 S. Ct. at 1276. Barbee only completed his Step 1 grievance—he did not receive a ruling on a Step 2 grievance—before filing suit. Compl. at 28, ECF No. 1; Appx. 8, ECF No. 1-1 (ECF pages 132-35); Def. Exs. 1 & 2.[6] The prison did not respond to Barbee's Step 2 grievance until November 8, 2022. *Id*. However, as shown above, Barbee has been aware of his conditions for many years. These grievances should have been filed many years ago. Barbee cannot create an exigency through a delay of many years and then complain that the TDCJ is not acting quick enough to resolve his requests.

It is also unclear from the grievances that Barbee is attempting to seek an accommodation specifically under the ADA with respect to being strapped to the gurney. Because Barbee did not properly exhaust administrative

---

[6]     Barbee's grievance exhibit does not include the prison's response, which is unfavorable for his case. The Defendants' exhibits supply that response. Defendants' Exhibit 1 contains only the relevant excerpt from Barbee's grievance records to prevent disclosure of confidential information, including Barbee's personal medical history.

remedies prior to bringing his claims in federal court, PLRA mandates dismissal of the complaint. Def. Exs. 1 & 2. If the merits of his complaint cannot be considered due to a lack of exhaustion, Barbee cannot make the required substantial showing required by the harm analysis.

> ### D.  Barbee has not made a strong showing that he will succeed on the merits.

> #### 1.  Eighth Amendment

The Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 139 S. Ct. at 1124 (affirming denial of challenge to single-drug pentobarbital challenge); *see also Lee*, 140 S. Ct. at 2591 (holding that challenge to federal single-drug pentobarbital protocol was unlikely to succeed on the merits in preliminary injunction context). To make out an Eighth Amendment method-of-execution claim, an inmate must establish that the chosen method creates "a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Glossip*, 576 U.S. at 877 (emphasis in original) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)). This requires showing "'a substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Baze*, 553 U.S. at 50). An inmate must also provide a "'feasible, readily implemented'" execution-method alternative

that is not "'slightly or marginally safer,'" but "'significantly reduce[s] a substantial risk of severe pain.'" *Id.* (quoting *Baze*, 553 U.S. at 51–52).

The Fifth Circuit previously rejected challenges to Texas's prior three-drug lethal injection process. *See generally Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010). However, at this point, Texas is currently using a single-drug pentobarbital protocol, which is also acceptable. *Bucklew*, 139 S. Ct. at 1120, 1134; *Lee*, 140 S. Ct. at 2591; *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016) ("The reality is that pentobarbital, when used as the sole drug in a single-drug protocol, has realized no . . . risk" that it "is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers.") (quotation omitted); *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014); *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012) ("Though Texas recently adopted a one drug protocol—also acceptable under the flexible *Baze* standard—the method at issue here exactly parallels the one cleared for use in *Raby*."). Use of pentobarbital has been upheld by many courts. *See Ringo v. Lombardi*, 677 F.3d 793, 798–99 (8th Cir. 2012) (noting that challenges to the use of pentobarbital have been denied). Moreover, the Fifth Circuit has denied certificates of appealabilty on challenges to the Texas lethal-injection protocol. *See*, *e.g.*, *Rivas v. Thaler*, 432 F. App'x 395, 404–05 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 404–05 (5th Cir. 2010).

*Baze* and *Glossip* govern all Eighth Amendment challenges, whether facial or as applied, alleging that a method of execution inflicts unconstitutionally cruel pain. *Bucklew*, 139 S. Ct. at 1122–29. Even considering Barbee's claims through the "as applied" lens, Barbee has not adequately demonstrated either a substantial risk of serious harm or a feasible and readily-implemented alternative that significantly reduces a substantial risk of severe pain. Here, the prison responded to Barbee's Step 1 grievance that "there will be no need to have his arms fully extended straight. Based on this Mr. Barbee will not suffer any extreme pain." Def. Ex. 1. And the prison responded similarly to his Step 2 grievance: "TDCJ will secure Mr. Barbee on the gurney in a manner that will not require him to fully extend his arms straight." Def. Ex. 2. This is confirmed by the Senior Warden of the Huntsville Unit, as described further below. Further, the prison has executed 576 inmates since 1982. Defendants have attached a spreadsheet (Def. Ex. 3) detailing pentobarbital executions in Texas dating back to 2012, when the current procedure was adopted. Barbee has failed to clearly identify even one case under the current protocol where the Defendants have been unable to accommodate the idiosyncratic health needs of its varied inmates. Given Texas's demonstrated history of uneventful executions with lethal injection under the current protocol, the risk of serious harm cannot be described as

objectively intolerable. *Glossip*, 576 U.S. at 877. The risk of harm is certainly not "sure or very likely." *Id*.

Barbee states that he has identified an execution-method alternative, as required by Supreme Court precedent. He requests "modifications to normal procedures that would allow him to lie on the gurney with arms bent and not outstretched." Compl. at 30, ECF No. 1. But Barbee's only evidence that the prison cannot accommodate his health needs is a picture of the gurney, which he implies cannot be adjusted. Compl. at 9 n.3, ECF No. 1 (citing Appx. 9, a picture of a gurney). But the prison already responded that "there will be no need to have his arms fully extended straight." Def. Exs. 1 & 2. That the prison's gurney cannot accommodate Barbee in the manner TDCJ represents is just his speculation from a picture. In fact, the execution protocol only states the inmate should be "secured to the gurney" and does not specify any particular method or procedure for doing so. Def. Ex. 4 at 10 (execution protocol). There is no written prohibition on leaving an inmate's arms loosely restrained. *Id*. Likewise, the protocol allows prison staff to find a suitable vein in another area of the body if a vein in the arm is not available. *Id*. The execution protocol thus leaves prison staff substantial discretion to effectuate an execution in the face of a wide range of prisoner circumstances.

Indeed, the Huntsville Senior Warden has explained that Barbee's arms will not be extended straight and may remain bent. Def. Ex. 5. The gurney's

leather straps are adjustable, allowing Barbee's arms to remain bent. *Id*. The prison has added extra padding to facilitate this. *Id*. And while the crook of the arm is the preferred location for IV insertion, staff will use another location if necessary, as they have done in previous executions. *Id*.

Barbee therefore fails to identify an execution-method alternative that is not just "'slightly or marginally safer,'" but "'significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 51–52).

Moreover, although Barbee frames his requested relief as an injunction, his relief would effectively force the Defendants to rewrite their protocol to accommodate his specific medical issues to execute him or create a point-by-point plan detailing how they intend to execute him. Such relief is not available to Barbee because it "is in the nature of mandamus." *Norton v. Enns*, 2:14-CV-0040, 2014 WL 3947158, at *3 (N.D. Tex. Aug. 12, 2014). Federal courts "do not have jurisdiction to issue the writ against a state actor or agency." *Id*. (citing *Moye v. Clerk, Dekalb Cnty. Superior Court*, 474 F.2d 1275 (5th Cir. 1973)). "Instead, if relief is available to [Plaintiff], he must obtain it through a mandamus action or other appropriate action in the state courts." *Id*. Here, Barbee is affirmatively seeking to compel the TDCJ to draft and enforce policy—mandamus relief. However, this Court lacks jurisdiction to compel TDCJ officials by writ of mandamus. *See, e.g.*, *Waters v. Texas*, 747 F. App'x

259, 260 (5th Cir. 2019) (affirming a jurisdictional dismissal where the plaintiff sought mandamus relief against "Texas state officials to deregister her as a Tier I sex offender").

Indeed, the Fifth Circuit has previously held that a district court may not require a prison to reduce a practice to writing. *See, e.g.*, *Gates v. Cook*, 376 F.3d 323, 338–39 (5th Cir. 2004). In *Gates*, the Fifth Circuit concluded that while a written policy may be "desirable," the PLRA does not authorize an injunction to go so far as to require the measure to be in writing. Injunctive relief must be narrowly drawn and extend no further than necessary to correct the alleged violation. 18 U.S.C. § 3626(a)(1)(A); *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015).

Ultimately, "what plaintiff[] [is] demanding is that, in effect, [he] be permitted to supervise every step of the execution process. [He has] no such entitlement." *Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013). Barbee seemingly wishes to micromanage his own execution, dictating how or if he is strapped to the gurney. Barbee makes these demands without any proof that Defendants' protocol—which has been used for many uneventful executions involving inmates of varying ages and health—is inadequate. This Court should decline to substitute its own judgment on how to conduct an execution for that of seasoned professionals.

### 2.    ADA claim

Barbee also claims that his execution violates the ADA. But Barbee fails to plead facts upon which the Court could infer Barbee has been "'excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity.'" *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). Barbee has not articulated a service or program he has been denied access to; nor has he demonstrated he has been denied access because of his disability. Further, to the extent that he properly made a request for accommodation, Barbee fails to state a prima facie claim because TDCJ has not denied him an accommodation. Rather, TDCJ responded to Barbee's grievances by crafting a reasonable accommodation.

To make out a prima facie case for failure to accommodate under the ADA or the Rehabilitation Act, a plaintiff must show (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations for such known limitations. *Feist v. La.*, *Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).

To begin, it is not clear that Barbee has demonstrated that he is a qualified individual with a disability under the ADA. His medical evaluations

31

do not appear to explicitly state that he is a qualified individual with a disability under the ADA. Appx. 5, ECF No. 1-1. But, assuming that Barbee is a qualifying individual, for purposes of proving ADA discrimination, it is important to distinguish between TDCJ's knowledge of a prisoner's disability versus the TDCJ's knowledge of any limitations experienced by the prisoner resulting from that disability. This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities. Whether TDCJ was aware of Barbee's medical conditions is not the question. Rather, the court must assess whether TDCJ officials were aware of Barbee's asserted limitations, and specifically, limitations relevant to Barbee's execution.

The burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms. *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 236 (5th Cir. 2017). "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents." *Id.* (quotations omitted). "[K]nowledge of a disability is different from knowledge of the resulting limitation. And it is certainly different from knowledge of the necessary accommodation." *Id.* at 238. "To

prevail, [Plaintiff] must adduce evidence that all three were or should have been obvious." *Id*.

Barbee's grievances did not request any particular accommodation. Nor has TDCJ denied him an accommodation. In fact, TDCJ offered a reasonable accommodation in response to Barbee's notice of limitation related his execution. Barbee submitted a Step 1 grievance complaining that his arms cannot extend and be secured to the gurney palms up. Def. Ex. 1. He does not indicate what he wanted TDCJ officials to do. *Id*. TDCJ's response to Barbee's Step 1 grievance was "there will be no need to have his arms fully extended straight." *Id*. In his Step 2 grievance, which he submitted on September 9, 2022, Barbee merely complains that TDCJ's Step 1 response did not provide enough detail about "how" his arms will be secured. Def. Ex. 2

TDCJ has already notified Barbee that they will accommodate his asserted limitation by not requiring his arms to be extended straight. Barbee's belief that this will not be sufficient to accommodate his disability is mere speculation and has no basis in fact. *Cf. Montgomery v. Barr*, 507 F. Supp. 3d 711, 729 (N.D. Tex. 2020) (denying failure-to-accommodate claim in the execution context).

As explained in the preceding section, TDCJ staff are trained professionals with significant experience in this arena. The protocol provides them substantial discretion to perform an execution in a safe and humane

manner, including by adjusting the straps restraining Barbee's arms or by inserting the IV line in a different area. The Huntsville Senior Warden has explained that Barbee's arms will not be forcibly straightened and that the gurney straps are adjustable. Def. Ex. 5. There is no basis for assuming that prison staff will not be able to accommodate Barbee as they indicated in their grievance response. Barbee's ADA claims are meritless.

### E.   Barbee will not suffer irreparable harm.

In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself suffice." *Barefoot*, 463 U.S. at 893. Barbee argues that his execution constitutes irreparable harm. Mot. Stay at 9, ECF No. 4. But this is a § 1983 action, which means that Barbee necessarily does not challenge the validity of his sentence. *Cf. Ochoa v. Collier*, 802 F. App'x 101, 106 (5th Cir. 2020), *cert. denied*, 140 S. Ct. 990 (2020). Even under the theories of his lawsuit, when Barbee is executed, his sentence has only been lawfully fulfilled—that is not irreparable harm. Rather, the actual harm that Barbee alleges is that will experience some pain during his execution. But "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47. "Simply because an execution method may

34

result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual.'" *Id.* at 50. Barbee's claim is entirely speculative—he has no historical basis for suggesting that he will be tortured or caused unreasonable pain. He identifies no similarly situated Texas inmate who experienced the problems that he envisions. Indeed, the prison's history, the prison's response to his grievance, and the Warden's affidavit show that the prison will be able to accommodate any limitations that he may have. "Here the [S]tate has not botched any execution since it instituted its protocol. But even if a mishap were to occur in [Plaintiff's] execution, that post-facto incident alone could not constitute evidence that he was sure or very likely to suffer needlessly ex ante." *Bible*, 739 F. App'x at 772.

### F.   The State and the public have a strong interest in seeing the state court judgment carried out.

The State and crime victims have a "powerful and legitimate interest in punishing the guilty." *Calderon*, 523 U.S. at 556 (citation omitted). And "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Bucklew*, 139 S. Ct. at 1133 (quotation omitted); *see Nelson*, 541 U.S. at 650 ("a State retains a significant interest in meting out a sentence of death in a timely fashion"); *Gomez v. United States Dist. Court*, 503 U.S. 653, 654 (1992) (per curiam) ("[e]quity must take into

consideration the State's strong interest in proceeding with its judgment"). Once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension." *Calderon*, 523 U.S. at 556. "Only with an assurance of real finality can the State execute its moral judgment in a case" and "the victims of crime move forward knowing the moral judgment will be carried out. *Id*. The State should be allowed to enforce its "criminal judgments without undue interference from the federal courts." *Crutsinger v. Davis*, 936 F.3d 265, 273 (5th Cir. 2019) (citations and internal quotations omitted).

Here, the public's interest lies in executing sentences duly assessed, and for which years of judicial review have found no reversible error. Barbee has already passed through the state and federal collateral review process. The public's interest is not advanced by postponing Barbee's execution any further, and the State opposes any action that would cause further delay. *Martel v. Clair*, 565 U.S. 648, 662 (2012) ("Protecting against abusive delay *is* an interest of justice.") (emphasis in original). Barbee killed a pregnant woman and a child. Seventeen years after the commission of Barbee's crime, justice should no longer be denied. *United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020).

Moreover, it bears repeating that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of a sentence of death." *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005). Thus, "[t]he federal courts can and should protect States from dilatory or speculative

36

suits[.]" *Hill*, 547 U.S. 585. As noted above, this lawsuit—belatedly filed three weeks before the execution—is precisely the sort of "dilatory tactic" that the Supreme Court has suggested that this Court not entertain. Even if the Court does not consider Barbee's dilatory behavior an independent ground for the denial of relief, it should still weigh heavily in the Court's analysis. Any stay should be denied.

## CONCLUSION

For the foregoing reasons, the Defendants ask that the Court deny any stay of execution. Alternatively, the Court should deny any stay *and* dismiss Barbee's lawsuit. *See*, *e.g.*, *Bible*, 2018 WL 3068804, at *11 ("Because this lawsuit cannot proceed without a stay of [Plaintiff]'s execution date, dismissal of the action is warranted.").

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
   for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*Attorney-in-charge           s/ Stephen M. Hoffman
                                  *STEPHEN M. HOFFMAN
                                  Assistant Attorney General
                                  Texas Bar No. 24048978
                                  Southern District Bar No. 602073
                                  P. O. Box 12548, Capitol Station
                                  Austin, Texas 78711
                                  Tel: (512) 936–1400
                                  Fax: (512) 320–8132
                                  Email: Stephen.Hoffman@oag.texas.gov

                                  ATTORNEYS FOR DEFENDANTS

38

## CERTIFICATE OF SERVICE

I do hereby certify that on November 9, 2022, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Allen Richard Ellis
Law Office of A. Richard Ellis
75 Magee Ave., Mill Valley, CA, 94941
Email: a.r.ellis@att.net

s/ Stephen M. Hoffman
STEPHEN M. HOFFMAN
Assistant Attorney General